**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 19, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

TYLER LUETHJE,

    Plaintiff - Appellee,

v.

TRAVIS KYLE; SCOTT KELLY,

    Defendants - Appellants.

No. 24-1257

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:23-CV-03054-CNS-MEH)**

_____

Andrew C. Steers, Douglas County Attorney's Office, Castle Rock, Colorado (W. Casey Brown on the briefs) for Defendants – Appellants.

Zachary L. Schiffler, Civil Rights Litigation Group, LLP, Denver, Colorado (Raymond K. Bryant with him on the brief) for Plaintiff – Appellee.

_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

This is an interlocutory appeal of the denial of Defendant-Appellants Travis Kyle and Scott Kelly's motion to dismiss Plaintiff-Appellee Tyler Luethje's § 1983 complaint based on qualified immunity. Mr. Kyle is a canine handler employed by the Douglas County Sheriff's Office, while Mr. Kelly is a Sheriff's Deputy employed

by the same office. Mr. Luethje's complaint alleges that on the evening of February 11, 2022, he was lying in bed at home when a police canine named Sig burst through his bedroom door and latched onto his left arm. Mr. Kyle and Mr. Kelly ("the deputies") were responding to a 911 call reporting that an unidentified male had approached Mr. Luethje's residence, broken the front window, and fled. The deputies, upon reaching the house and seeing the broken window, pushed Sig into the residence to bite the first person he encountered. After Sig found and latched onto Mr. Luethje, the deputies entered his bedroom and questioned him for over one minute while Sig continued to bite his arm. The deputies then called Sig off, ordered Mr. Luethje out of bed, handcuffed him, and placed him under arrest. Paramedics arrived and transported Mr. Luethje to the hospital, where he was treated for several lacerations and puncture wounds. Mr. Luethje was not charged with any crime.

Mr. Luethje sued Mr. Kyle and Mr. Kelly under 42 U.S.C. § 1983, asserting claims under the Fourth Amendment for (1) unlawful entry and search of his home, (2) unlawful arrest, and (3) unlawful use of excessive force. He also brought a failure to intervene claim against Mr. Kelly. The deputies moved to dismiss, arguing they were entitled to qualified immunity on each claim. The district court disagreed, holding that for each claim, the deputies had violated Mr. Luethje's constitutional rights and that the law establishing those rights was clearly established.

For the reasons explained below, we agree that Mr. Kyle and Mr. Kelly were not entitled to qualified immunity on any claim. Accordingly, we affirm.

2

# I.   BACKGROUND

## A.   *Facts*

Mr. Luethje alleges as follows in the operative amended complaint.[1] On February 11, 2022, at approximately 6:40 p.m., a neighbor called 911 and reported seeing a male break the front window of Mr. Luethje's residence. The caller could not provide a description of the male. Mr. Kelly, a Douglas County Sheriff's Deputy, was dispatched to the home, along with "several other deputies with long rifles." App. at 7. Also dispatched was Mr. Kyle, a dog handler employed by the Douglas County Sheriff's Office, along with his police canine, Sig. There were no reports of anyone entering the home prior to the arrival of law enforcement. While Mr. Kelly and Mr. Kyle later claimed they could hear a voice inside the home, they heard nothing suggesting violence or an ongoing crime.

Mr. Kyle approached the broken window at the front of the house with Sig. He noticed the screen was still in place. Mr. Kelly removed the screen and knocked out the rest of the glass to enable Mr. Kyle to "put his canine through the window." *Id.* at 8. Mr. Kyle ordered Sig to "find and bite whomever it found inside the residence, regardless of whether the person(s) were lawfully at the residence and regardless of whether the canine found a child or adult." *Id.* Sig was sent into the home

---

[1] At the motion to dismiss stage, we consider all well-pleaded allegations to be true and view them in the light most favorable to the non-moving party, Mr. Luethje. *See, e.g.*, *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).

unsupervised. The deputies apparently did not knock or announce themselves before Sig was let into the house.[2]

After about thirty seconds, Sig located Mr. Luethje sleeping in his bed. Sig "immediately started biting Mr. Luethje in the hands, abdomen, and arm." *Id.* Mr. Luethje "screamed out in pain," but did not otherwise resist or attempt to remove Sig's teeth from his body. *Id.* From outside the home, having heard Mr. Luethje scream, Mr. Kyle yelled, "bring my dog to me!" *Id.* Mr. Kyle and Mr. Kelly then entered the residence through the broken window after Mr. Kelly finished clearing the glass. The pair quickly located Mr. Luethje in the bedroom with Sig "latched onto his left arm," as he screamed, "I live here! I live here! I live here!" *Id.* The deputies watched Sig "jerking and pulling on Mr. Luethje's left arm while biting him," "like a dog aggressively playing with a chew toy," but "casually stood next to him" and made no move to make Sig stop, even as Mr. Luethje "remained completely compliant." *Id.* at 9. Instead, Mr. Kyle proceeded to question Mr. Luethje, asking if anyone else was inside and who broke the front window. Mr. Luethje confirmed no one else was home and stated he had broken the front window to get inside. During

---

[2] On appeal, the deputies assert that they "attempted to contact the occupant" of the house but "received no response to their announcements." Appellants' Br. at 4; *see also id.* at 6 (noting Mr. Luethje did not specifically allege that the deputies failed to make announcements). But there is no support in the complaint for those assertions. Because we must construe allegations and all inferences therefrom in the light most favorable to Mr. Luethje, and because he alleges that the deputies finished breaking the window and sent Sig into the house almost immediately, we assume no announcements were made first. To assume otherwise would improperly go beyond the allegations and require making inferences in the deputies' favor.

this questioning, Sig continued to "clamp down" on Mr. Luethje's arm for "approximately one minute" until Mr. Kyle finally removed Sig from Mr. Luethje's arm. *Id.*

The deputies then handcuffed Mr. Luethje, despite the "extreme pain" he was in from the dog bites and the fact his left arm had gone numb. *Id.* The deputies walked Mr. Luethje—who was wearing sweatpants but no shirt, shoes, or socks—outside into the "freezing" February night and placed him in the back of a patrol vehicle. *Id.* Next, emergency medical services arrived and transferred Mr. Luethje to a gurney. At this point, the deputies took possession of Mr. Luethje's driver's license. The license verified that Mr. Luethje was asleep at his own home when Sig attacked.

After Mr. Luethje was transported to the hospital in an ambulance, the deputies reentered Mr. Luethje's home and "conducted a thorough search." *Id.* at 10. They located no other person and found no evidence of a crime. Mr. Luethje ultimately was not charged for any crime.

Mr. Luethje sustained injuries to his abdomen, left hand, and left arm from Sig's bites, "causing extreme pain and requiring emergency treatment and follow-up medical care." *Id.* The lacerations caused scarring, while the canine bites caused nerve damage which has resulted in "tingling, numbness, persistent pain, and loss of sensation to his left hand and arm." *Id.*

### B.    *Procedural History*

Mr. Luethje filed suit against Mr. Kyle and Mr. Kelly in November 2023. The operative amended complaint states three claims against both Mr. Kyle and Mr. Kelly

5

under 42 U.S.C. § 1983: (1) unlawful search and entry of Mr. Luethje's home, (2) unlawful arrest, and (3) excessive force, all in violation of the Fourth Amendment. Mr. Luethje brings an additional § 1983 claim against Mr. Kelly under the Fourth Amendment for failure to intervene.[3]

The deputies filed a motion to dismiss, arguing they are protected by qualified immunity because Mr. Luethje's allegations "fail[ed] to show any . . . violation of clearly established law." *Id.* at 22. As part of their motion, the deputies submitted a link to the audio of the 911 call that prompted the events underlying the suit. In ruling on the motion, the district court considered the 911 audio alongside the amended complaint as "central to [Mr. Luethje's] claims." *Id.* at 86 n.4. However, the district court ultimately agreed with Mr. Luethje that, based on the facts alleged and the 911 audio, the deputies were not entitled to qualified immunity. Accordingly, the district court denied the deputies' motion.

As to the first claim (unlawful entry and search), the district court held the deputies had not demonstrated exigent circumstances which could justify their manner of entry. As to the second claim, unlawful arrest, the district court held the deputies did not have probable cause to justify the warrantless arrest of Mr. Luethje. And as to the third claim, excessive force, the district court held the deputies' use of force was not objectively reasonable under the totality of the circumstances. The

---

[3] Mr. Luethje also brings Colorado state law claims, but those are not at issue in this appeal.

district court also noted that the deputies' argument for dismissing the failure to intervene claim against Mr. Kelly was based on their other arguments that no clearly established constitutional violations had occurred, and having concluded Mr. Luethje sufficiently pleaded clearly established constitutional violations, that argument also failed. The deputies timely appealed.

## II.    LEGAL STANDARDS

We review Federal Rule of Civil Procedure 12(b)(6) motions based on qualified immunity *de novo*. *See, e.g.*, *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). "[A]ll well-pleaded allegations in the complaint must be accepted as true and viewed in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted).

"[A]sserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (quotation marks omitted). This is because the court analyzes only "the defendant's conduct *as alleged in the complaint*," while at summary judgment, the plaintiff "can no longer rest on the pleadings" and the court must evaluate all the evidence before it. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

Nevertheless, the qualified immunity standard is "exacting," and "gives government officials breathing room to make reasonable but mistaken judgments." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Put simply, qualified immunity

7

protects 'all but the plainly incompetent or those who knowingly violate the law.'"
*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Malley v. Briggs*, 475
U.S. 335, 341 (1986)). Asserting the affirmative defense of qualified immunity
"creates a presumption that the defendant is immune from suit." *Truman*, 1 F.4th
at 1235. A plaintiff overcomes this presumption only by showing (1) the defendant's
actions violated a constitutional right, and (2) the right was clearly established at the
time of the violation. *Thomas*, 765 F.3d at 1194.

"A right is clearly established when a Supreme Court or Tenth Circuit decision
is on point, or if the clearly established weight of authority from other courts shows
that the right must be as the plaintiff maintains." *Truman*, 1 F.4th at 1235 (internal
quotation marks omitted). The relevant "precedent is considered on point if it
involves materially similar conduct or applies with obvious clarity to the conduct at
issue." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (internal quotation
marks omitted). "[A] case directly on point" is not necessary if "existing precedent
[has] placed the statutory or constitutional question beyond debate." *White v. Pauly*,
580 U.S. 73, 79 (2017) (per curiam) (quoting *Mullenix*, 577 U.S. at 12). Thus,
"'[g]eneral statements of the law' can clearly establish a right for qualified immunity
purposes if they apply 'with obvious clarity to the specific conduct in question.'"
*Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quoting *Hope v. Pelzer*,
536 U.S. 730, 741 (2002)); *see also Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (per
curiam) (noting "a general constitutional rule already identified in the decisional law
may apply with obvious clarity to the specific conduct in question" even without a

case directly on point (quoting *Hope*, 536 U.S. at 745)). As such, "our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Truman*, 1 F.4th at 1235 (quotation marks omitted).

## III.    ANALYSIS

We consider the deputies' qualified immunity defense for each of Mr. Luethje's three asserted § 1983 claims. For each, we first hold Mr. Luethje has adequately demonstrated a constitutional violation, and second, that the right violated was clearly established by February 11, 2022. *See Thomas*, 765 F.3d at 1194. Before turning to those questions, however, we address whether the district court properly considered the audio recordings submitted by the deputies.

### A.    *Audio Recordings*

The 911 audio submitted by Mr. Kyle and Mr. Kelly appears to have combined three separate recordings: (1) audio of the 911 caller reporting that an unidentified male had broken the window of Mr. Luethje's residence; (2) audio of the dispatcher reporting a potential burglary to law enforcement based on the 911 call; and (3) audio of the officers arriving at the residence and sending in the canine. The district court considered the full tape as a unit and determined that "the recording is sufficiently central to [Mr. Luethje's] claims" to consider it as part of the amended complaint because the parties did not dispute its authenticity and "the 911 call triggered the incident in question, and [Mr. Luethje] refers to it, albeit briefly, throughout his amended complaint." App. at 86 n.4.

9

Relying on documents outside of the complaint is an "exception[]" to the general rule that "the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Therefore, a district court may "consider documents . . . referenced in the complaint" only if "they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (internal quotation marks omitted). Otherwise, if documents beyond the complaint are considered, the motion must be converted to a motion for summary judgment "to afford the plaintiff an opportunity to respond." *Id.* (quotation marks omitted). To qualify for the "central to the plaintiff's claim" exception, "*all* . . . documents" considered must be clearly referred to in the complaint to be properly incorporated. *Gee*, 627 F.3d at 1187; *see also Waller v. City and County of Denver*, 932 F.3d 1277, 1282–83 (10th Cir. 2019) (holding that incorporating documents not referred to in the complaint "ignores the clear language of our precedents").

Here, the complaint mentions the 911 call, and we agree with the district court that the call is sufficiently central to Mr. Luethje's claims to be considered on a motion to dismiss without conversion to summary judgment. The subsequent dispatch of the 911 call to officers is sufficiently derivative of the call to also be considered. However, there is no reference in the complaint to the later part of the recording documenting the deputies' approach to Mr. Luethje's residence. In the absence of any reference to that part of the recording in the complaint, that section of the recording could not be considered in ruling on the motion to dismiss. This is especially so

where the district court identified problems with that section of the audio calling into question its completeness. *See* App. at 87 n.5 ("The Court acknowledges that there may be a 'break' in the audio (as indicated by beeps in the recording), but that information was not briefed or otherwise presented to the Court."). Accordingly, we consider only the initial 911 call and the immediate dispatch to the deputies in our analysis.

### B.    *Unlawful Search*

Mr. Luethje alleges that Mr. Kyle and Mr. Kelly violated his Fourth Amendment right to be free of unreasonable searches and seizures when they entered his home without a warrant and caused him to be injured by the canine "while he slept in his bed." App. at 11. The deputies argue they are entitled to qualified immunity on this claim because the warrantless entry of Mr. Luethje's home was justified by exigent circumstances, specifically, the reasonable belief there was a residential burglary in progress.[4] They further argue it was not clearly established that entering the home in these circumstances was unconstitutional. We disagree.

---

[4] As Mr. Luethje points out, the deputies did not argue before the district court that the second entry and search of Mr. Luethje's home was justified by exigent circumstances, only that the first entry was. *See* App. at 26–30 (the deputies' motion to dismiss); *id.* at 82 n.3 (noting the deputies did not challenge the claim as it related to the subsequent search of the home after Mr. Luethje was taken to the hospital).

On appeal, the deputies make a one-sentence argument as to the subsequent search of the residence: "[Mr. Luethje] fails to allege the Deputies lacked consent from the homeowner to perform the search, and therefore fails to state such a claim." Appellants' Br. at 22. In oral argument, for the first time, the deputies asserted that this search was valid as a "protective sweep." Oral Argument, 13:10–14:23. Neither argument was presented before the district court and we thus decline to consider them: "absent extraordinary circumstances, arguments raised for the first time on

### 1.    Constitutional Violation

"The Fourth Amendment protects the right of the people to be secure in their houses against unreasonable searches." *Cuervo v. Sorenson*, 112 F.4th 1307, 1314 (10th Cir. 2024) (citing U.S. Const. amend. IV). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–88 (1980) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). Therefore, "[a] search inside a home is presumptively unreasonable apart from the authority of a search warrant or an exception approved by the Supreme Court." *Cuervo*, 112 F.4th at 1315.

---

appeal are waived." *Little v. Budd Co., Inc.*, 955 F.3d 816, 821 (10th Cir. 2020), *as corrected* (Apr. 6, 2020); *see also United States v. Gaines*, 918 F.3d 793, 800–01 (10th Cir. 2019) (noting we generally decline to consider new arguments raised during oral argument).

And even if we considered these new arguments, they would fail, because the deputies' assertions are contradicted by the allegations in the complaint: "Despite confirming that Mr. Luethje lived at the residence and that no crime had occurred, [the deputies] re-entered Mr. Luethje's home and conducted a thorough search," during which they "did not locate any other person inside the home." App. at 10. It would be impossible from that set of alleged facts to conclude that the deputies had somehow received permission from a different homeowner to conduct the search. It would also be impossible to characterize the "thorough search" as a protective sweep while construing the allegations in the light most favorable to Mr. Luethje, the non-movant. *See also* Oral Argument, 13:10–14:23 (conceding that the second search as alleged was not constitutional). Thus, we affirm the district court's order denying the deputies' motion to dismiss the warrantless search claim insofar as it relates to the second search of Mr. Luethje's residence.

12

One such exception is exigent circumstances, namely, when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment," such as "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). For example, in *Brigham City*, the Supreme Court held exigent circumstances justified a warrantless entry into a home where officers responded to a call regarding a loud party and could clearly see a violent altercation taking place from outside through windows and a screen door. *Id.* at 400–01. One officer opened the screen door and announced the officers' presence, but was unheard over the "tumult." *Id.* at 401. He then stepped in and announced himself again, at which point the residents noticed the police and the altercation ended. *Id.* The Court held this warrantless entry was "plainly reasonable under the circumstances" because there was an objectively reasonable basis "for believing both that the injured [party] might need help and that the violence in the kitchen was just beginning." *Id.* at 406. Further, the "manner of the officers' entry was also reasonable" because the officer first announced himself through the open screen door before entering, and only when no one heard him did he step inside and announce himself again. *Id.* The Court held the announcement was "at least equivalent to a knock on the screen door" and "was probably the only option that had even a chance of rising above the din." *Id.* at 406–07.

Distilling these principles from *Brigham City*, we have held a warrantless search is excused by exigent circumstances where "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). It is the government's burden to demonstrate exigent circumstances to justify a warrantless entry, including in qualified immunity cases. *See, e.g.*, *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011); *McInerney v. King*, 791 F.3d 1224, 1231 (10th Cir. 2015). We take each prong in turn.

### a.    Need to Protect Lives or Safety

As to whether the deputies had an "objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others," we determine whether law enforcement had an objectively reasonable belief in "an *immediate need* to protect [the officers'] lives or others from serious injury or threatened injury." *McInerney*, 791 F.3d at 1233 (alteration in original and quotation marks omitted). We evaluate whether there was an objectively reasonable belief by considering the information the officers had at the time of the entry, including the investigative steps they took to confirm there was an emergency. *Id.*

Thus, in *Najar*, we held there was an objectively reasonable belief in an immediate need to protect safety where the officers had received several disconnected 911 calls from a mobile home, made several announcements once they arrived at the mobile home, and could see someone inside ignoring their

14

announcements. 451 F.3d at 715–16. When the occupant eventually answered, he stated no 911 calls had been made. *Id.* at 716–17. In those circumstances, "[a] reasonable person could well be concerned that someone was trying to prevent communication with safety officials." *Id.* at 720. But in *McInerney*, there was no objectively reasonable belief in an emergency where officers serving an arrest warrant encountered potentially troubling signs—a house with open windows, strewn belongings, and a resident known for substance abuse—but no immediate signs someone was imminently in danger. *See* 791 F.3d at 1227–28. This was not enough to establish exigent circumstances because the officers "did not overhear any commotion," "observe any altercation occurring through the open windows or door," or identify any "evidence that anyone was inside [the plaintiff's] home, much less a person in need of immediate, emergency assistance." *Id.* at 1233–34.

Here, Mr. Kyle and Mr. Kelly did not have an objectively reasonable belief in an ongoing emergency. As alleged in the complaint, the only information the deputies had before arriving was that an unidentified male had broken a window and fled the scene. Upon arriving, the deputies confirmed the window was broken but observed nothing further that would suggest an ongoing emergency—such as hearing or seeing a violent altercation or encountering an occupant lying about whether 911 calls had been placed from the home. And unlike law enforcement in *Najar*, the deputies' investigation upon arriving at the house was perfunctory: they confirmed the window was broken and later claimed they heard a voice inside. The deputies performed no

15

further investigation before removing the screen from the broken window, clearing the remainder of the glass, and sending the canine inside.

The deputies' argument they "reasonably believed" there was a suspect inside who was "reluctant to talk to the police" stretches the facts alleged beyond recognition; the complaint's allegations do not establish the deputies attempted to make any contact with the person inside or even make announcements before sending in the canine. Appellants' Br. at 19. The bare possibility that someone was committing a crime inside, without more, is not sufficient to warrant an objectively reasonable belief in an ongoing emergency.

b.    *Scope and Manner of Search*

In *Brigham City*, the Supreme Court recognized the scope and manner of a warrantless search was reasonable where the officer first announced himself through an open screen door before entering, and only stepped inside and announced himself when no one heard him. 547 U.S. at 406–07. And in *Najar*, the scope and manner of a search was reasonable when the three officers who entered and searched a mobile home conducted only a quick sweep of areas where a victim might be found based on where the officers witnessed the suspect moving from outside the trailer. 451 F.3d at 719–20; *see also id.* at 719 (commending the officers' "restraint and circumspection" in using "repeated and increasingly vigorous attempts to make contact with the person they could see inside" instead of "simply batter[ing] down the door").

16

By contrast, based on the allegations in the complaint and the inferences in favor of Mr. Luethje, Mr. Kyle and Mr. Kelly made no attempts to announce their presence or make contact with anyone inside Mr. Luethje's home before clearing the window, sending in the police canine alone and unsupervised, and commanding the canine to bite "whomever it found" first. App. at 8; *see also* Oral Argument at 5:19–59 (deputies' counsel agreeing the canine could have bitten anyone from a homeowner to a five-year-old child). While the officers in *Brigham City* and *Najar* entered and conducted searches only after failed attempts to announce themselves, the deputies here made no such effort. And when the deputies entered, they did not open a door, step into the home, and announce themselves. Instead, they sent in a canine, unsupervised, with the command to bite the first person it found. Especially given the lack of any ongoing emergency or threat to safety, the scope and manner of this search was not reasonable.

Additionally, Mr. Kyle and Mr. Kelly make no meaningful attempt to argue the second prong of the exigent circumstances analysis. When pressed at oral argument, the deputies' counsel reiterated that the scope and manner of the search was reasonable because the canine enabled the deputies to quickly locate and "neutralize" the burglary suspect. Oral Argument at 4:15–5:59. But the only information the officers had was that a suspect had broken a window and then run away. Letting the canine enter first without conducting any additional investigation and without any indication that an emergency was unfolding was not objectively

reasonable. As counsel admitted, the canine was as likely to bite a child residing in the home as any intruder.

**2.      Clearly Established**

It was clearly established by February 11, 2022, when this warrantless entry and search took place, that law enforcement must have an objectively reasonable belief in an ongoing emergency to justify a warrantless entry and search. An objectively reasonable belief can be established by observing clear indicia of an emergency, such as encountering ongoing violence, *see Brigham City*, 547 U.S. at 400–01, or a series of hung-up 911 calls coupled with a person at the scene denying such calls had been made, *Najar*, 451 F.3d at 715–17. It was also clearly established that observing open windows and scattered belongings, without any signs of violence or disorder, does not constitute an ongoing emergency. *McInerney*, 791 F.3d at 1233–34. Additionally, a single witness creating "innuendo and speculation," without more, cannot constitute a reasonable belief in an ongoing emergency. *Cortez v. McCauley*, 478 F.3d 1108, 1124 (10th Cir. 2007). These longstanding Supreme Court and Tenth Circuit cases "involve[] materially similar conduct" and "appl[y] with obvious clarity" to the conduct at issue here, where the deputies saw only a broken window and suspected a burglary, but encountered no indicia of an emergency, violence, or an ongoing crime. *Lowe*, 864 F.3d at 1208 (internal quotation marks omitted).

It was also clearly established that the scope and manner of a search is reasonable where officers make announcements, show "restraint" in their entry, and

18

limit the search to only places where they suspect a victim or evidence could be. *Najar*, 451 F.3d at 719–20; *see also Brigham City*, 547 U.S. at 406–07. Based on this case law, a reasonable officer in these circumstances would be on notice that a warrantless entry, without any announcements and using a police canine, was not reasonable in manner or scope.

Because Mr. Luethje's allegations establish Mr. Kyle and Mr. Kelly violated Mr. Luethje's constitutional rights and the violation was clearly established, they are not entitled to qualified immunity as to the unlawful search claim.

### C.    *Warrantless Arrest*

Mr. Luethje alleges that Mr. Kyle and Mr. Kelly violated his Fourth Amendment rights when they arrested him without probable cause. The deputies argue they had probable cause to arrest Mr. Luethje for criminal mischief. Appellants' Br. at 24. As discussed below, we hold Mr. Kelly and Mr. Kyle violated Mr. Luethje's constitutional rights because they did not have probable cause to arrest him for criminal mischief, and did not have even arguable probable cause, making that violation clear. As a result, they are not entitled to qualified immunity on this claim.

### 1.    **Constitutional Violation**

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *Donahue v. Wihongi*, 948 F.3d 1177, 1189 (10th Cir. 2020) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Probable cause exists if "the facts and circumstances within the arresting officers' knowledge and of which they had

reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Adams v. Williams*, 407 U.S. 143, 148 (1972) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Additionally, "an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Id.* at 54 n.2. When an officer claims probable cause to arrest under a state law, we look to the text of the state statute—as well as decisions from that state's highest court interpreting the statute, if needed—to determine whether the officer had probable cause to arrest under the specific elements of the state statute. *See, e.g.*, *A.M. v. Holmes*, 830 F.3d 1123, 1140–41 (10th Cir. 2016); *Mglej v. Gardner*, 774 F.3d 1151, 1163–64 (10th Cir. 2020); *Cronick v. Pryor*, 99 F.4th at 1262, 1170–71 (10th Cir. 2024).

The corollary to the above is that where an officer lacks an objectively reasonable basis to believe a suspect has committed an offense, there is no probable cause. *See, e.g.*, *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1310 (10th Cir. 2015); *Cortez*, 478 F.3d at 1116–17. Additionally, "[a]n unreasonable mistake of fact cannot furnish probable cause." *Maresca*, 804 F.3d at 1310. Instead, officers are "require[d]" "to reasonably interview witnesses readily available at the scene, investigate basic

20

evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." *Cortez*, 478 F.3d at 1117 (quotation marks omitted). And officers "are charged with knowledge of any readily available exculpatory evidence that they unreasonably fail to ascertain." *Maresca*, 804 F.3d at 1310 (internal quotation marks omitted).

The deputies argue they had probable cause to arrest Mr. Luethje for criminal mischief. We disagree; analyzing "the events leading up to [Mr. Luethje's] arrest," we hold "th[o]se historical facts, viewed from the standpoint of an objectively reasonable police officer," would not "amount to probable cause" to arrest for criminal mischief. *Wesby*, 583 U.S. at 56–57 (quoting *Pringle*, 540 U.S. at 371).

We will not find probable cause to arrest if the behavior plainly does not match the elements of the crime alleged. *See Mglej*, 974 F.3d at 1163–63 (holding no probable cause to arrest under Utah statute which criminalizes refusal to provide name when arrestee refused to provide a driver's license). Additionally, an officer's "unreasonable mistake of fact" or "mistaken and unreasonable belief" that criminal conduct has occurred cannot constitute reasonably trustworthy information, especially where the mistake could be corrected by "recognizing the commonsense implications" of the situation or by obtaining "readily available information" to verify a crime has been committed before effectuating an arrest. *Maresca*, 804 F.3d at 1310–11.

Under the Colorado criminal mischief statute, "[a] person commits criminal mischief when he or she knowingly damages the real or personal property of one or

more other persons, including property owned by the person jointly with another person or property owned by the person in which another person has a possessory or proprietary interest, in the course of a single criminal episode." Colo. Rev. Stat. § 18-4-501(1). The parties agree the arrest of Mr. Luethje began when the canine bit him while he was in bed and prevented him from moving. *See* Appellants' Br. at 29; Appellee's Br. at 19. This focuses our inquiry on whether the facts leading up to the moment the deputies released Sig into the house provided probable cause for criminal mischief.

The answer is plainly no. Under the statute, a person is liable for criminal mischief if that person "knowingly damages the real or personal property of one or more other persons, including property owned by the person jointly with another person." C.R.S. § 18-4-501(1). The deputies argue they reasonably suspected the same person who broke the window would be the first person Sig found inside. But taking the facts in the light most favorable to Mr. Luethje, as we must at this stage, all the deputies knew was that someone had broken a window and then run away. And as soon as the deputies arrived at Mr. Luethje's house, without any further investigation, they finished breaking the window and let Sig inside. For the deputies to believe that the first person Sig found *inside* the house was the person who had broken the window and run away was unreasonable based on the totality of the circumstances.

But even assuming the deputies reasonably suspected someone inside the house had broken the window based on the 911 call—and therefore had "reasonably

22

trustworthy information" that someone had "knowingly damaged"

"real . . . property . . . in the course of a single criminal episode"—they did not have

*any* information at the moment Sig was released indicating that *the first person* Sig

found inside was the person who broke the window. *See* Colo. Rev. Stat.

§ 18-4-501(1). Or even if Sig bit the person who broke the window, the officers had

no way to know whether that person was the sole owner of the house such that

breaking the window would not comprise criminal mischief. They would have

probable cause to arrest someone only if they had "reasonably trustworthy

information" that the first person Sig found inside the quiet house was an intruder or

not the sole owner of the home. While there may have been a bare possibility based

on the 911 call that someone had broken into the house, the officers had no further

information—much less "reasonably trustworthy information"—at the moment they

let Sig in the window, moments after arriving on scene, that the first person he found

inside was an intruder. The report from the 911 call was not enough to support

probable cause where some basic investigation—such as making announcements and

seeing if anyone came to the door—could dispel any suspicion that a crime was

underway. *See Cortez*, 478 F.3d at 1116–17. An officer's "mistaken and unreasonable

belief" that criminal conduct has occurred cannot constitute reasonably trustworthy

information, especially where the mistake could be corrected with "readily available

information." *Maresca*, 804 F.3d at 1311; *see also Cortez*, 478 F.3d at 1116–17.

The district court correctly concluded that based on the allegations in

complaint, Mr. Luethje was arrested without probable cause.

**2.    Clearly Established**

To determine whether Mr. Luethje's rights were clearly established, we ask "if the [deputies] *arguably* had probable cause—a lower standard than actual probable cause." *Cronick*, 99 F.4th at 1269. "Arguable probable cause exists where a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Id.* (quotation marks omitted); *see also Holmes*, 830 F.3d at 1140 ("[I]n the § 1983 qualified-immunity context, an officer may be mistaken about whether he possesses *actual* probable cause to effect an arrest, so long as the officer's mistake is reasonable."). The officers' subjective intentions do not enter into this analysis. *See Cronick*, 99 F.4th at 1270.

A reasonable police officer in the same circumstances and with the same information that Mr. Kyle and Mr. Kelly had at the moment they let Sig into the house—that someone had broken a window and fled, and that the house showed no indications of violence or an ongoing emergency—could not have reasonably believed that probable cause existed to arrest the first person inside for criminal mischief. Again, the deputies acknowledge the seizure began the moment Sig bit Mr. Luethje's arm. No reasonable officer could have reasonably believed that the first, unknown person Sig found inside was the same person who had broken the window and fled in the absence of *any* basic investigation of the residence, such as

knocking, making announcements, or listening for signs of violence or a burglary in progress.

Further, a reasonable officer in February 2022 would be aware that such a search is unsupported by even arguable probable cause based on long-established case law. In *Cortez*, for instance, officers went to a residence to investigate a babysitter's boyfriend for suspected child abuse based on a third-hand report from a nurse who had treated the child earlier that day. 478 F.3d at 1112–13. Without conducting any further investigation, the officers arrested the suspect as soon as he answered the door. *Id.* at 1113. We explained under these circumstances, the officers could not have reasonably believed there was probable cause: "whether we view it as a need for more pre-arrest investigation because of insufficient information, or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed." *Id.* at 1116–17 (internal footnote and citation omitted). Here, the deputies relied on a lone report relayed by a dispatcher that someone had broken a window and run away, and they conducted no further investigation beyond confirming the broken window before effectuating Mr. Luethje's arrest.

Similarly, to have even arguable probable cause to arrest under a state statute, an officer must reasonably believe under the "plain language" of the statute there is probable cause. *Mglej*, 974 F.3d at 1151. Thus, in *Mglej*, there was not arguable probable cause to arrest someone under a statute that forbids someone from not disclosing their name to a police officer where the suspect had shared his name but

had refused to give his driver's license. *Id.* at 1163–64. Here, under the plain language of the Colorado criminal mischief statute, someone can commit criminal mischief only if he or she "knowingly damages the real or personal property *of one or more other persons*." Colo. Rev. Stat. § 18-4-501(1) (emphasis added). A reasonable officer could not believe that the first person the police canine located inside the quiet residence was the person who had broken the window and an intruder—not a resident—without conducting even cursory further investigation.

Therefore, it was clearly established that Mr. Kyle and Mr. Kelly violated Mr. Luethje's Fourth Amendment rights by arresting him without probable cause, and the deputies are not entitled to qualified immunity on this claim.

### D.      *Excessive Force*

Mr. Luethje alleges that using a police canine to enter his home and bite his arm—and then leaving the canine on his arm for over a minute while Mr. Kyle and Mr. Kelly questioned him—constituted excessive force in violation of the Fourth Amendment. The deputies argue they are entitled to qualified immunity on this claim because the force was reasonable under the circumstances and it was not clearly established in February 2022 that the use of force was unconstitutional. We disagree.

### 1.      Constitutional Violation

For Mr. Luethje to state an excessive force claim under the Fourth Amendment, he must show "both that a seizure occurred and that the seizure was unreasonable." *Vette v. K-9 Deputy Unit Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (quotation marks omitted). The parties do not dispute that Mr. Luethje was

26

subject to a seizure when Sig bit him, so the only question is whether the seizure was reasonable. We use the three factors outlined in *Graham v. Connor* to "guide the reasonableness analysis: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In conducting this analysis, we "look[] at the facts and circumstances as they existed at the moment force was used, while also taking into consideration the events leading up to that moment." *Id.* (quotation marks omitted). This inquiry considers the totality of the circumstances and is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

After weighing the factors and considering the totality of the circumstances, the district court concluded the jury could find the deputies engaged in conduct that violated Mr. Luethje's constitutional right to be free from excessive force. Our de novo review leads us to the same conclusion.

First, as to the severity of the crime, the deputies argue this factor tilts in their favor because they suspected Mr. Luethje of committing burglary, a felony under Colorado law. *See Vette*, 989 F.3d at 1170 ("[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony."); Colo. Rev. Stat § 18-4-203. Although we have concluded Mr. Kelly and Mr. Kyle had no probable cause to arrest Mr. Luethje for criminal mischief, "we do not merely assume *no* crime was at issue." *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012). Rather, "in an excessive force

inquiry, we ask whether the force used would have been reasonably necessary *if the arrest or the detention were warranted*." *Id.* (internal quotation marks omitted). Assuming the deputies reasonably believed the crime was a burglary, this factor tilts in their favor, "only because we must assume the arrest was valid." *Id.* However, because the second and third *Graham* factors weigh strongly in Mr. Luethje's favor, this determination does not affect the outcome. *See id.* at 1195 n.4.

The second *Graham* factor, whether Mr. Luethje posed an immediate threat to the deputies, is "undoubtedly the most important." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017). We hold it weighs strongly in Mr. Luethje's favor. In evaluating this factor, "we must look at whether the [deputies or others] were in danger at the precise moment that they used force." *Vette*, 989 F.3d at 1170 (internal quotation marks omitted). We "look[] at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020). Where a suspect is "unarmed" and "outnumbered," this factor tilts in the plaintiff's favor. *Anderson v. DelCore*, 79 F.4th 1153, 1165 (10th Cir. 2023). Under the facts alleged in the complaint, there was no indication that Mr. Luethje posed any threat to the deputies at the moment they deployed force. To recap, the deputies were responding to a possible burglary based on a report a suspect had broken a front window and fled the scene. When "several" deputies arrived with long rifles, they confirmed the broken window but witnessed no signs of violence or anything suggesting an ongoing crime. App. at 7–8. Rather than investigate further or

28

determine if a burglary was actually in progress, Mr. Kyle and Mr. Kelly deployed force in the form of their police canine. At that moment, there was no indication Mr. Luethje posed any threat to the deputies, much less an "immediate" one. Rather, he was lying asleep in bed.

Indeed, during oral argument, the deputies conceded there was no immediate risk to them as they stood outside the house, but asserted they reasonably believed residents in the home could be in danger. Oral Argument at 10:25–58; 11:23–39. But again, there were no signs of violence or indications of an ongoing emergency; the house was quiet. A broken window and suspicion of a burglary, without more, does not generate a reasonable belief a third party is in immediate danger. In short, looking at the facts and circumstances as they existed at the moment the deputies deployed force, and taking into account the information the deputies had leading up to that moment, a reasonable officer would not have thought sending in the canine was necessary to protect anyone from immediate harm.[5]

The third *Graham* factor also weighs heavily in Mr. Luethje's favor because there was no indication he was "actively resisting arrest or attempting to evade arrest by flight." *Vette*, 989 F.3d at 1171. Again, this factor asks us to consider "whether

---

[5] Indeed, as Mr. Luethje argues, to the extent the deputies suspected there was a victim inside—which was not apparent from any of the facts alleged in the complaint—sending in the canine risked harming the supposed victim as much as it would have harmed the supposed intruder. *See* Oral Argument at 5:19–59 (the deputies' counsel agreeing the dog could have found an innocent homeowner or child first but asserting using the canine was nonetheless reasonable).

29

the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use[] of force." *Id.* When the deputies let Sig into the house, there was no indication that Mr. Luethje was fleeing—and as he alleges, he did not know until the moment Sig bit him that there was any arrest to be evaded.[6]

Finally, *Graham* instructs us to "balance . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," and consider ultimately "whether the officers' actions are objectively reasonable." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010) (quoting *Graham*, 490 U.S. at 396). Thus, in *Cavanaugh*, where the officer's weapon of choice was a taser, which "caus[es] temporary paralysis and excruciating pain," "the 'nature and quality' of the intrusion into the interests of [the plaintiff] protected by the Fourth Amendment was quite severe." *Id.* at 665. Similarly, in *Vette*, striking the plaintiff with a dog chain and releasing a police dog to attack him was objectively unreasonable in light of the fact there was no immediate threat and no risk of flight. 989 F.3d at 1171.

Here, the deputies chose to release a police dog into the home to apprehend by biting the first person it found, ostensibly to catch the suspect of the alleged burglary. The dog bit Mr. Luethje several times and caused lasting nerve damage. The "nature and quality" of this intrusion was "severe," whereas the "countervailing

---

[6] During oral argument, the deputies acknowledged that this factor weighs in Mr. Luethje's favor. Oral Argument at 10:58–11:23.

30

governmental interests at stake" were comparatively light given that there was no immediate threat to the deputies and that there was no flight risk. *Graham*, 490 U.S. at 396. Considering the *Graham* factors and the totality of the circumstances, the deputies' use of the canine was not reasonable. Therefore, the deputies violated Mr. Luethje's Fourth Amendment right to be free of excessive force.

## 2.    Clearly Established

It was clearly established in February 2022 that it would constitute excessive force to use a police canine to arrest and then continue to bite a non-resisting, non-fleeing suspect.

Our case law distinguishes pre-restraint and post-restraint force. *See, e.g.*, *Vette*, 989 F.3d at 1172 (determining only whether it was clearly established using canine force on an "already apprehended" suspect was unconstitutional); *McCoy v. Meyers*, 887 F.3d 1034, 1047–48 (10th Cir. 2018) (analyzing pre-restraint and post-restraint force separately). Accordingly, we discuss first whether it was clearly established that using the canine initially to arrest and restrain Mr. Luethje was clearly established as an unconstitutional use of force, and second, whether allowing the canine to continue to bite Mr. Luethje while the deputies questioned him for over a minute was clearly established excessive force.

As for pre-restraint force, a reasonable officer would have known in February 2022 based on our previous cases applying *Graham* that using a police canine to bite and restrain a non-violent, non-resisting suspect was unconstitutional. For example, in *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012), police responded to a domestic

disturbance. *Id.* at 1189. After one of the residents began walking toward police officers, "two of the police officers lunge[d] towards [Morris] and put their hands on his shoulders, twisted him around and ran him into the bushes . . . throwing him to the ground." *Id.* at 1190 (alterations in original). The officers then "put their knees [on him and] fell into his midsection and his back and handcuffed him." *Id.* We held this constituted excessive force under the *Graham* factors, noting that although Morris might have seemed threatening as a "large man," he "carried no weapon, made no overt threats, and did not get within reach of [the officers]." *Id.* at 1196. As to whether it was clearly established the use of force was a constitutional violation, even though there were no prior cases involving a similar police tackle, the force was clearly unjustified based on the *Graham* factors, and therefore, "[a] reasonable officer . . . would not have needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped . . . and who present[ed] no indications of dangerousness." *Id.* at 1197–98 (quoting *Raiche v. Pietroski*, 623 F.2d 30, 39 (1st Cir. 2010)).

Similarly, in *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), the plaintiff, Casey, was returning to a courthouse to pay a fine when "[w]ithout further explanation or discussion, Officer Sweet [the defendant] then grabbed Mr. Casey's arm and put it in a painful arm-lock," and continued to struggle with Mr. Casey while not informing him he was under arrest. *Id.* at 1280. We found this constituted excessive force, explaining:

> Officer Sweet grabbed and then tackled Mr. Casey without ever telling him that he was under arrest. Nor did he give Mr. Casey a chance to submit peacefully to an arrest. While the reasonableness of his force must be judged

32

> from the officer's perspective, Mr. Casey also testified that he repeatedly asked, "What are you doing?" as he was grabbed and tackled. Given this, a reasonable officer should, at a minimum, have ordered Mr. Casey to submit to an arrest or used minimal force to grab him while informing him that he was under arrest.

*Id.* at 1282 (internal citation omitted). In determining whether this constitutional violation was clearly established, we found "no case in which a citizen peacefully attempting to return to the courthouse" was subjected to such a level of force "all without warning or explanation," and we held that no reasonable officer "could believe that he was entitled to behave as Officer Sweet allegedly did." *Id.* at 1285. We further noted that *Graham* had recognized use of "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Id.* (citing 490 U.S. at 396).

Similarly, in *Cavanaugh*—in which officers used a taser without warning against a woman suspected of a misdemeanor—we held it was clearly established that when an officer uses force against a non-violent misdemeanant who "pose[s] no threat and who [is] given no warning or chance to comply with the officer's demands," the Fourth Amendment is violated. 625 F.3d at 666–67. And in *Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008), we held it was clearly established that using "tear gas, pepper spray and non-lethal projectiles" on peaceful protestors who posed no threat to officers violated the Fourth Amendment. *Id.* at 1290–91. We explained that "an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a

reasonable officer to conclude that there was a legitimate justification for acting as she did." *Id.* at 1291 (quotation marks omitted).

In short, it is clearly established under Tenth Circuit law that it violates the Fourth Amendment to use force without warning against a non-violent, non-resisting suspect who is given no chance to comply—a constitutional violation made clear by the application of the *Graham* factors. True, this line of cases involves suspects committing potential misdemeanors, not felonies. But it is also clearly established by our case law that the second *Graham* factor is the most important, and that even when the first factor weighs in an officer's favor, where the second two factors weigh heavily in favor of the plaintiff, we will find excessive force. *See, e.g.*, *Vette*, 989 F.3d at 1170–71; *Morris*, 672 F.3d at 1195–96. Thus, a reasonable officer would have understood that even when investigating a potential felony, using force with no legitimate justification violates *Graham*'s reasonableness test and constitutes excessive force.

In arguing this right was not clearly established, the deputies rely heavily on *Martinez v. Jenneiahn*, No. 22-1219, 2023 WL 4482404, at *1 (10th Cir. July 12, 2023), *cert. denied*, 144 S. Ct. 811 (2024), a non-precedential decision in which we held that the law was not clearly established that officers used excessive force when they used a police canine to apprehend a suspect with outstanding felony warrants who was hiding in a closet. But the case is distinguishable. There, the officers knew exactly which suspect they were pursuing, knew he had outstanding felony warrants, and the canine had alerted to a closet, informing the police he was inside. *Id.* After

standing outside of the closet for ten to twelve minutes and with no way of knowing if the suspect inside was hostile, the officers chose to use the canine to apprehend the suspect. *Id.* Here, the officers did not know which suspect they were pursuing (or even if a crime had been committed) and did not undertake any basic investigation to determine who was inside the house or whether that person might be dangerous before they released the canine. And here the intrusion was into the home, not a public outbuilding in which the suspect had no privacy right. Under our precedent, the use of force here was unreasonable.

As to the argument that the deputies could not know that using a canine in this situation could amount to excessive force, *Vette* proves the opposite. In analyzing post-restraint force, *Vette* traced the case law clearly establishing that "continued use of force after an individual has been subdued is a violation of the Fourth Amendment," and then held that even though there was no precise case on point at the time about police canines, our case law was clear that use of force against a subdued individual is a "clearly established constitutional violation[]" regardless of the precise form of force. 989 F.3d at 1172 (quotation marks omitted). Similarly, here, although we have no prior case concerning pre-restraint force on non-violent, non-resisting suspects and police canines, our extensive case law holding that using excessive pre-restraint force against a non-violent, non-resisting suspect is unconstitutional is sufficient to put officers on notice. That is especially true where, in *Vette*, we held that use of a police canine can constitute excessive force. In short, it

35

was clearly established under our case law in February 2022 that using a canine to restrain a non-violent, non-fleeing suspect could constitute excessive force.

Finally, as for post-restraint force, *Vette* puts it beyond cavil that using a police canine to attack a restrained suspect constitutes excessive force. 989 F.3d at 1172–73. In *Vette*, after a suspect was handcuffed, officers allowed their police canine to "attack" him, specifically allowing the dog to bite the suspect's right shoulder. *Id.* at 1159. We held that this constituted a Fourth Amendment violation under *Graham*, *id.* at 1170–71, and that the violation was clearly established at the time of the incident in 2017, *id.* at 1173–74. The facts in *Vette* mirror the facts here as to post-restraint force: the deputies agree that Mr. Luethje was arrested at the moment Sig bit him. When the deputies found Mr. Luethje and recognized he was under arrest, rather than remove Sig, they allowed Sig to continue to bite Mr. Luethje for "approximately one minute" while they questioned him, ignoring his shouts of pain. App. at 9. This post-restraint use of force was plainly unconstitutional as established in *Vette*. Therefore, no reasonable officer would have thought it was acceptable to allow Sig to continue to bite and maul Mr. Luethje for over a minute when he was already arrested, subdued, and not fleeing.

Because Mr. Kyle and Mr. Kelly used unreasonable force against Mr. Luethje, and because it was clearly established that using force under these circumstances

36

violated the Constitution, the district court properly denied qualified immunity to the deputies on this claim.[7]

## IV.    CONCLUSION

For the reasons above, we AFFIRM the order of the district court.

---

[7] Because we conclude that the deputies are not entitled to qualified immunity on any of the three individual claims, Mr. Kelly is likewise not entitled to qualified immunity on the failure to supervise claim.