**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 3, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

AMBER STEPP and JONATHON STEPP,
individually and as parents and next friends
of J.S., a minor child,

     Plaintiffs - Appellees,

v.

JASON LOCKHART; SCOTTIE
RUSSELL; STEVE WOODS; LESLIE
CRANK; RUSTY BLUE; COURTNEY
MORELAND; KATHY ANDERSON;
BILL BLAIR; TRACY BRYANT,
individuals,

     Defendants - Appellants,

and

TALIHINA PUBLIC SCHOOL
DISTRICT, an Oklahoma political
subdivision, a/k/a Independent School
District No. 52 of Oklahoma County,
Oklahoma; KEVIN MCCLAIN, an
individual,

     Defendants.
_____

AMBER STEPP and JONATHON STEPP,
individually and as parents and next friends
of J.S., a minor child,

     Plaintiffs - Appellees,

No. 25-7038

v.

KEVIN MCCLAIN, an individual,

     Defendant - Appellant,

and

JASON LOCKHART; SCOTTIE
RUSSELL; RUSTY BLUE; STEVE
WOODS; LESLIE CRANK; COURTNEY
MORELAND; KATHY ANDERSON;
BILL BLAIR; TRACY BRYANT,
individuals; TALIHINA PUBLIC
SCHOOL DISTRICT, an Oklahoma
political subdivision, a/k/a Independent
School District No. 52 of Oklahoma
County, Oklahoma,

     Defendants.

No. 25-7039

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:24-CV-00146-JAR)**

_____

Mr. Adam S. Breipohl, Rosenstein, Fist & Ringold, Tulsa, Oklahoma, and Mr. Jason L.
Callaway, Johnson & Jones, P.C., Tulsa, Oklahoma (Frederick J. Hegenbart and
Rhiannon K. Thoreson, Rosenstein, Fist & Ringold, Tulsa, Oklahoma; and Whitney M.
Eschenheimer, Johnson & Jones, P.C., Tulsa, Oklahoma, with them on the briefs),
appearing for Appellants.

Mr. J. Blake Johnson, Overman Legal Group, PLLC, Oklahoma City, Oklahoma (Kelsey
Frobisher Schremmer, Overman Legal Group, PLLC, Oklahoma City, Oklahoma, and
Wyatt McGuire, McGuire Law Firm, Edmond, Oklahoma, with him on the brief),
appearing for Appellee.

_____

Before **MATHESON**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.

_____

2

_____

**MATHESON**, Circuit Judge.
_____

Plaintiffs Amber and Jonathon Stepp, parents of minor child J.S., filed this action alleging that J.S. was placed in an all-boys fifth-grade class at his local elementary school, then subjected to harassment and discriminatory conduct by his teacher, and ultimately removed from the school altogether after he and his parents complained about the sex-segregated classes and the teacher's mistreatment. The complaint included claims under 42 U.S.C. § 1983 for violations of procedural due process, substantive due process, and equal protection rights, as well as retaliation and conspiracy claims. Defendants[1] moved to dismiss, arguing they were entitled to qualified immunity from most of the § 1983 claims. The district court granted in part and denied in part the motions to dismiss.

This interlocutory appeal challenges the district court's denial of qualified immunity on certain § 1983 claims. Exercising jurisdiction under 28 U.S.C. § 1291, we dismiss the appeal of one of the claims for lack of interlocutory jurisdiction. On the remaining claims, we affirm in part and reverse in part. We remand for further proceedings.

---

[1] As detailed below, the Stepps sued the school district and various school officials and teachers in their individual capacities. We refer to the individual capacity defendants in this opinion as "Defendants."

## I. BACKGROUND

### A. *Key Participants*

Several entities and many individuals were involved in this case. The following played significant roles:

1. **Plaintiffs**

Amber Stepp and Jonathon Stepp brought this action individually and as parents and next friends of J.S., their minor child.

2. **Defendants**

- Talihina Public School District ("TPSD")

- Members of the Talihina Public School Board of Education ("the Board")

   o Scottie Russell – President

   o Steve Woods – Vice-President

   o Leslie Crank – Clerk

   o Rusty Blue

   o Courtney Moreland

   o Jason Lockhart – Superintendent of TPSD

- Participants from the Talihina Elementary School ("TES")

   o Kathy Anderson – Principal

   o Kevin McClain – Teacher

   o Bill Blair – Title IX officer

   o Tracy Bryant – Title IX officer

3. **Non-Defendants**

- Oklahoma State Department of Education ("OSDE")

- Rebecca McLemore  – TES Title IX officer

- Rowdy Johnson – TES hall monitor

## B. *Factual Allegations*[2]

1. **Segregation Policy**

In August 2022, at Superintendent Lockhart's and Principal Anderson's direction, TES implemented a policy to separate fifth-grade students based on their sex.  Under this policy, TES would have two fifth-grade "homeroom" classes—one for boys and taught by a man, and one for girls and taught by a woman.  App. Vol. I at 32.  Homeroom teachers were responsible for teaching core subjects and supervising their students for most or all of each day.

Eleven-year-old J.S. started fifth grade at TES.  Under the policy, he was assigned to the all-boys fifth-grade homeroom class taught by Mr. McClain.

2. **First Week**

During the first week, Mr. McClain "frequently and loudly yelled at the all-boys fifth grade class in general, and at J.S. in particular." *Id.* at 33. Mr. McClain's behavior escalated during the second week.  He "increasingly singled

---

[2] Because these appeals arise from the district court's partial denial of motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), we draw the facts from well-pled factual allegations in the operative complaint, here the second amended complaint ("SAC").  *See Ashaheed v. Currington*, 7 F.4th 1236, 1249 (10th Cir. 2021); *Thomas v. Kaven*, 765 F.3d 1183, 1188 n.1 (10th Cir. 2014).

out J.S. for repeated and excessive discipline," including yelling at J.S. "in such a loud and violent manner that both J.S. and [another] student were reduced to tears in front of" their class and that children in other "separate classrooms" could hear the yelling, *id.* at 33-34; "aggressively berating J.S. until he broke down in tears," *id.* at 34; and refusing, in retaliation for J.S. having questioned him about a physical altercation between two students, to permit J.S. "to go to the office or call his dad" when he reported "feel[ing] unwell," *id.*

J.S. reported at least some of Mr. McClain's behavior to his parents. Another parent also contacted Ms. Stepp on August 24, 2022, about Mr. McClain's treatment of J.S.

On August 25, 2022, Mr. Stepp met with Superintendent Lockhart to complain about Mr. McClain's "targeted and disproportionate treatment of J.S. during class." *Id.* at 34. He "explicitly raised his concerns about his son's safety and wellbeing at school." *Id.* "TPSD responded by placing a 'hall monitor,'" Rowdy Johnson, "outside McClain's classroom for the purpose of periodically checking on or watching McClain's interactions with the boys." *Id.* at 35. According to the Stepps, "TPSD took no other action at th[at] time." *Id.*

3. **Second Week**

During the second week, despite the hall monitor's presence, Mr. McClain "raised . . . inappropriate topics with his all-boys class, including at least a discussion about kissing and about drawings of male genitals." *Id.* He "used these topics to target J.S. for harassment and bullying—pointing at J.S. and telling J.S.'s classmates

6

that they must not draw male genitals because J.S. is 'queer.'" *Id.* "McClain then joined other students in laughing at this comment." *Id.* He also, "after witnessing J.S. and other boys playfully roughhousing, . . . instructed his class that they should yell 'f** alert!' any time that another boy unwantedly touched them." *Id.*

Other students in J.S.'s class reported that Mr. McClain yelled violently at J.S. Further, "[o]ne or more of J.S.'s classmates expressed to their parents or guardians fears for J.S.'s safety and their own in McClain's class as a result of his behavior directed at J.S." *Id.* at 37.

The Stepps contacted Mr. McClain, eventually spoke with him by phone, and "confronted him about his behavior." *Id.* He admitted "to using the phrase 'f** alert,' and to yelling at J.S. and other boys in the class, but maintained this behavior was all for the purposes of 'correcting' their behavior." *Id.* Mr. McClain also "admitted to talking with the children about drawing penises in notebooks, but defended the statement by saying that 'maybe [J.S.] is not mature enough to handle it.'" *Id.* He suggested to the Stepps that "instead of just yelling to discipline J.S. in the future[,] . . . he would instead send J.S. to . . . Anderson's office . . . to get 'paddled.'" *Id.* Mr. McClain "acknowledged that he knew his conduct was generally inappropriate for a fifth grade class and that he would not have used certain terms or raised certain topics had fifth grade *girls* been present." *Id.* at 38.

On or about August 29, 2022, the Stepps met with Mr. McClain, Superintendent Lockhart, Mr. Johnson, and Rebecca McLemore, who served as a TES Title IX officer. The Stepps expressed their concerns about Mr. McClain's

conduct, "requested information from Lockhart and McLemore concerning *how* to file a formal Title IX complaint, and asked about contacting the Board." *Id.*

4. **Title IX Complaint**

Following the meeting, Ms. McLemore called Ms. Stepp and requested that the Stepps complete an Incident Report/Form concerning their allegations against Mr. McClain. Although the form did not mention Title IX, Ms. McLemore told the Stepps that the form "served as [their] formal complaint of sexual harassment under Title IX." *Id.* at 39. After receiving the completed form, Ms. McLemore provided Mr. McClain with a "Notice of Sexual Harassment Complaint." *Id.*

Ms. McLemore then "initiated an impromptu Title IX investigation." *Id.* at 44. Principal Anderson, however, "refused to provide McLemore with any notes or other documents memorializing her conversations with McClain or concerning the allegations raised by [the Stepps]." *Id.* at 45. She informed Ms. McLemore that "Lockhart's notes and statement alone were sufficient." *Id.* at 45-46. "From that point forward, Anderson refused to cooperate with" the investigation. *Id.* at 46.

5. **J.S.'s Removal from Classroom and Modified Schedule**

"[I]n response to [the Stepps'] report of harassment, TPSD removed J.S. from the classroom and sent him home with a single sticky note of instruction." *Id.* at 43. TPSD, Superintendent Lockhart, Principal Anderson, and the Board "refused to remove McClain from the all-boys fifth grade classroom" during the investigation of the Stepps' harassment report. *Id.* As a result, the Stepps "declined to send J.S. back" to Mr. McClain's classroom out of "concerns for J.S.'s safety and well-being

8

. . . and fears of potential retaliation by McClain." *Id.* TPSD and Superintendent Lockhart "proposed putting J.S. in the all-girls fifth grade classroom," but the Stepps "refused this offer because," in their view, "such placement would only further stigmatize and harm J.S. and further ostracize him from his peers." *Id.*

Principal "Anderson eventually worked with [the Stepps] to set J.S. on a modified school schedule." *Id.* Under that schedule, J.S. "attend[ed] only one period of classroom instruction (Language Arts) with approximately half of the boys in his class" and, "for the remainder of the school day," stayed in the library, "sometimes alone and sometimes with a handful of other students (not necessarily other fifth graders)." *Id.* at 43-44. "J.S. received little to no help or instruction from teachers in relation to any subject," and his "grades dropped." *Id.* at 44. TES then "removed J.S. from his extracurricular activities, such as basketball, on the pretextual basis of his lowering grades." *Id.*

6. **Board Meeting**

On September 6, 2022, the Stepps attended a public Board meeting and "presented to the Board their concerns with McClain's behavior and bullying of J.S. and with [TES's] ongoing policy of sex segregation." *Id.* at 46. "Other parents and grandparents at the meeting corroborated [the Stepps'] experiences with McClain and shared the concerns and fears of their own children and grandchildren." *Id.* The Board members "asked no questions" and "made no comments" during the meeting, and afterwards "declined to take any action or vote concerning either McClain's

treatment of J.S. and other students or [TES's] underlying policy of sex . . . segregation." *Id.*

### 7. Closure of the Title IX Investigation

Ms. McLemore resigned from her position in early September 2022. Bill Blair and Tracy Bryant, both Title IX officers for TES, took over the investigation into the Stepps' complaints. They did not interview the Stepps or J.S., and there is no evidence they interviewed the parents or guardians of the children who reported Mr. McClain's behavior. At no time were the Stepps allowed to review the evidence gathered by Mr. Blair and Mr. Bryant or "any resulting investigative report or findings." *Id.* at 48.

On or about September 17, 2022, Principal Anderson called Mr. Stepp and informed "him that the investigation had closed and that no other information would be provided to him or his family." *Id.* at 49. She also told the Stepps "that any modified schedule previously offered to accommodate J.S. during the course of the Title IX investigation was revoked and that J.S. would be expected to return to in-person instruction in McClain's all-boys class, effective immediately." *Id.* The Stepps were not informed of their right to appeal the results of the investigation, but instead were told the decision was final.

### 8. Change in Segregation Policy

On September 29, 2022, the Oklahoma State Department of Education ("OSDE") sent a letter to Superintendent Lockhart and TPSD advising them that TES's policy of segregating its fifth-grade students on the basis of sex violated

10

federal civil rights laws and directing them to take immediate corrective action no later than October 10, 2022.

After receiving the OSDE's letter, Principal Anderson sent letters to the parents and guardians of each fifth-grade student informing them that TES would be "transition[ing]" the sex-segregated "5th grade classrooms to an integrated 5th grade environment." *Id.* at 51. The letter stated that each child would "be moved for one class period only out of [his/her] present classroom setting to comply with [the OSDE's] directive." *Id.* It explained that each child "w[ould] change for one class period on one of [their] core subjects"—"Math, Reading/Writing, Science, and Social Studies"—but would otherwise "remain in [their] present classroom setting for all other classes." *Id.*

Some parents, after receiving Principal Anderson's letters, "asked questions of TPSD, Anderson," and other school officials, "and demanded an explanation for the sudden change in their kids' respective schedules." *Id.* Principal Anderson responded that J.S. was the impetus for the change and "blam[ed] [the Stepps] to deflect other parents' aggravations with [TES] and McClain." *Id.* at 52. During a meeting with Mr. Stepp on October 10, 2022, she accused Mr. Stepp of lying and informed him that no other parents had complained about TES's sex-segregation policy.

J.S. returned to school on October 12, 2022. The plan was for J.S. to receive instruction from a female teacher in the morning and from Mr. Blair in the afternoon.

Mr. Blair "required J.S. to sit on the floor as opposed to at a desk or table" for at least two class periods that afternoon and for the remainder of the week. *Id.* at 53.

9. **Basketball Game Incident**

During the week of October 17, 2022, the Stepps attended a school basketball game held in another town. J.S. was expected to play. Mr. Stepp saw Mr. Blair at the game "and asked him about J.S. being required to sit on the ground the prior week." *Id.* Mr. Blair first "seemed to ignore" Mr. Stepp, but then "rushed at the Stepp family, leaned over them in the bleachers, and got into [Mr. Stepp's] face." *Id.* "Blair was then joined by his own family members and the group . . . engaged in a profanity-laced tirade against [Mr. Stepp] and his family, which included both physical threats . . . and defamatory statements about J.S." *Id.* After Mr. Blair and his family were escorted out of the gym, the Stepps and their children "exited the gym through a back door so as to avoid a confrontation with Blair and his family." *Id.* at 54.

10. **Stepps' Withdrawal from TES**

The Stepps concluded, based upon all of the events, "that they were not welcome at TPSD or its public functions and could not, in the future, safely report any issues of sexual harassment or bullying." *Id.* at 55. As a result, they chose "to pull J.S. and his siblings from" TES, which was "the only public school in the[ir] immediate vicinity." *Id.* Further, J.S. has, due to these events, "been forced to confront uninvited questions about his sexuality . . . and otherwise navigate the complexities of being involuntarily labeled a 'queer' or a 'f**' in a small town." *Id.*

12

## C. *Procedural Background*

The Stepps filed this action in April 2024, and twice amended their complaint. The operative SAC asserted 15 claims against 11 defendants, including various Title IX and § 1983 claims, and assorted state law claims. The § 1983 claims included:

- Count Four–J.S. against TPSD and Mr. McClain alleging equal protection, procedural and substantive due process violations, and to be free from unlawful discrimination;

- Count Five–J.S. against the Board members, Superintendent Lockhart, and Principal Anderson for procedural and substantive due process and equal protection violations, and to be free from sex and gender discrimination at school;

- Count Six–all Plaintiffs against Principal Anderson, Mr. Blair, and Mr. Bryant for retaliating against them in violation of the First Amendment for filing a Title IX complaint;

- Count Seven–all Plaintiffs against all Defendants for conspiring to deprive Plaintiffs of their constitutional rights under the Fifth and Fourteenth Amendments; and

- Count Nine–all Plaintiffs against TPSD, the Board members, and Superintendent Lockhart for retaliating against Plaintiffs in violation of the First Amendment for filing a Title IX complaint, participating in the Title IX grievance process, and speaking at a public school board meeting.

All of the named Defendants except for Mr. McClain ("the School District Defendants") filed a joint motion to dismiss the SAC. Mr. McClain filed his own motion to dismiss the SAC.

In April 2025, the district court issued two opinions addressing the motions to dismiss. In the first opinion, the court addressed Mr. McClain's motion. It concluded Mr. McClain was entitled to qualified immunity on the Count Four

13

procedural due process claim and the Count Seven conspiracy claim. The court denied Mr. McClain qualified immunity on the Count Four substantive due process and equal protection claims.

In the second opinion, the district court addressed the School District Defendants' motion. It concluded that Principal Anderson, Superintendent Lockhart, and the Board members were entitled to qualified immunity on the Count Five substantive due process claim. The court also concluded that Mr. Blair and Mr. Bryant were entitled to qualified immunity on the Count Seven conspiracy claim. The district court otherwise denied the motion to dismiss the Count Five procedural due process and equal protection claims, the Counts Six and Nine retaliation claims, and the Count Seven conspiracy claim.

The School District Defendants (Appeal No. 25-7038) and Mr. McClain (Appeal No. 25-7039) filed timely notices of appeal, arguing the district court erred in denying them qualified immunity on the aforementioned claims.

### D. *Jurisdiction and Legal Background*

1. **Jurisdiction**

The district court's denials of the individual defendants' claims of qualified immunity on certain of the § 1983 claims "fall within the narrow class of appealable orders despite the absence of a final judgment." *Ashcroft v. Iqbal*, 556 U.S. 662, 671-72 (2009) (quotations omitted). We thus have jurisdiction under 28 U.S.C. § 1291 to review those portions of the district court's orders. *See id.* at 672

14

("[A] district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291.").

2. **Standards of review**

"We conduct de novo review of the denial of a motion to dismiss for qualified immunity." *Williams v. Hansen*, 5 F.4th 1129, 1132 (10th Cir. 2021).  In conducting this review, "we analyze[] the defendant's conduct *as alleged in the complaint*." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quotations omitted). "[A]ll well-pleaded allegations in the complaint must be accepted as true and viewed in the light most favorable to the plaintiff." *Id.* (quotations omitted).

"In the context of a § 1983 action against multiple individual governmental actors, it is particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her." *Id.* (quotations omitted); *see also Iqbal*, 556 U.S. at 673-75 (holding that an appellate court has jurisdiction, when reviewing an interlocutory appeal of a denial of a motion to dismiss based on qualified immunity, to pass on the sufficiency of the pleadings).

3. **Personal Participation**

"It is well settled that a plaintiff" in a § 1983 action "must prove each defendant personally participated in a constitutional violation." *Griffith v. El Paso Cnty.*, 129 F.4th 790, 822 (10th Cir. 2025).  In other words, "liability [must] be predicated on a violation traceable to a defendant-official's 'own individual

actions.'" *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 676).

"A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). Personal liability "under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir. 1997).

For supervisory liability, the personal participation requirement stems from lack of vicarious or respondeat superior liability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978) (holding there is no respondeat superior liability under § 1983). A defendant cannot be liable merely for being a supervisor or having knowledge of a subordinate's constitutional violation. *See Iqbal*, 556 U.S. at 677.

To establish supervisory liability, a plaintiff must "show an affirmative link between a supervisor and the alleged constitutional injury." *George v. Beaver Cnty.*, 32 F.4th 1246, 1255 (10th Cir. 2022). This requires a plaintiff to "prove: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* (quotations omitted). The first element states the

personal involvement requirement. *See Dodds v. Richardson*, 614 F.3d 1185, 1196 (10th Cir. 2010). Addressing post-*Iqbal* supervisory liability, we said, "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy." *Id.* at 1199.

4. **Qualified Immunity**

"[Q]ualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted).

"A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show both that [1] a constitutional violation occurred and [2] that the constitutional right was clearly established at the time of the alleged violation." *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (quotations omitted). "A court evaluating qualified immunity is free to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . ." *Id.* (quotations omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001); *see Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."

17

*Mullenix*, 577 U.S. at 11 (quotations omitted). "The law is clearly established when a Supreme Court or Tenth Circuit precedent is on point or the alleged right is clearly established from case law in other circuits." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017). The relevant "precedent is considered on point if it involves *materially similar conduct* or applies with *obvious clarity* to the conduct at issue." *Id.* (quotations omitted).

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). A prior decision must sufficiently address the prohibited conduct so "that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)); *see T.D. v. Patton*, 868 F.3d 1209, 1236 (10th Cir. 2017) (clearly established law puts a reasonable person in defendant's circumstances on notice that the conduct is unconstitutional). That said, "our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Truman*, 1 F.4th at 1235 (quotations omitted).

A defendant asserting qualified immunity at the motion to dismiss stage faces a higher bar than those asserting the defense at the summary judgment stage. *Luethje v. Kyle*, 131 F.4th 1179, 1187 (10th Cir. 2025). "This is because the court analyzes only the defendant's conduct *as alleged in the complaint* . . . ." *Id.* (quotations omitted). Even so, qualified immunity is an "exacting" standard, *id.*

18

(quoting *City of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015)), and "protects all but the plainly incompetent or those who knowingly violate the law," *id.* (quoting *Mullenix*, 577 U.S. at 12).

## II.  DISCUSSION – SCHOOL DISTRICT DEFENDANTS – APPEAL NO. 25-7038

The School District Defendants, challenging the denials of qualified immunity on the Stepps' § 1983 claims, argue "that the [district] court erred in concluding Plaintiffs pled sufficient facts to reasonably infer that any individual Defendants' acts or omissions constituted a constitutional violation."  Aplt. Br. at 19.  They further contend that the district court erred in concluding that clearly established law "prohibit[ed] the individual Defendants' actions."[3]  *Id.*  We address these arguments on a claim-by-claim basis.

### A.  *Count Five – Procedural Due Process*

Count Five of the SAC alleged that

(1) Principal Anderson, Superintendent Lockhart, and the individual Board members violated J.S.'s procedural due process rights "[b]y

---

[3] Defendants also argue that the district court failed to adequately address whether the law was clearly established.  If that is so, we may remand the clearly-established-law issue to the district court, *see Kerns v. Bader*, 663 F.3d 1173, 1182 (10th Cir. 2011), or we may resolve it in this appeal when it presents a "pure matter of law," *Cox v. Glanz*, 800 F.3d 1231, 1246 n.7 (10th Cir. 2015).  The second prong of qualified immunity involves a pure matter of law.  *See Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985).  We exercise our discretion to address it here.  *See Baca v. Cosper*, 128 F.4th 1319, 1327 n.5 (10th Cir. 2025) (we "retain[] the independent power to identify and apply the proper construction of governing law" on whether the law applicable to a § 1983 claim was clearly established (quotations omitted)).

19

adopting, implementing, and enforcing a policy of segregation based on sex in [TES's] fifth grade program," App. Vol. I at 64-65;

(2) "[e]ven after receiving an order from OSDE to correct [the] violations of federal law, Defendants failed to fully integrate, at least during the remainder of the 2022-2023 Academic Year, and continued— in spirit and effect—to continue [the] offending conduct," *id.* at 65;

(3) "[a]s a result of Defendants' adoption (or ratification), implementation, enforcement, and approval of" the sex-segregation policy, the Stepps "were left with no choice but to withdraw J.S. from TPSD and remove him from [TES]," and J.S. was deprived of his right to a free public education and related support services, *id.*

The Stepps argue this claim "centers on TPSD Officials' individual participation in (i) approving and enforcing an obviously unconstitutional policy of sex-based segregation of public-school students, despite Plaintiffs' complaints, and (ii) a constitutionally inadequate and objectively unfair handling of those complaints that culminated in the complete deprivation of J.S.'s education without notice or hearing." Aplee. Br. at 32. The latter "second basis" includes the removal of J.S. "from his classroom without process." *Id.* at 33.[4]

1. **Legal Background**

"Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment." *Mathews v. Eldridge,*

---

[4] In our view, Count Five does not plainly allege this removal ground as a basis for plaintiffs' procedural due process claim. Regardless, we conclude that this claim, even if properly alleged, was subject to dismissal for the reasons outlined below.

424 U.S. 319, 332 (1976) (quotations omitted). "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Merrifield v. Bd. of Cnty. Comm'rs,* 654 F.3d 1073, 1078 (10th Cir. 2011).

In *Goss v. Lopez,* 419 U.S. 565 (1975), the Supreme Court held that, "on the basis of [Ohio] state law," a group of Ohio public high school students "had legitimate claims of entitlement to a public education," and that this was "a property interest . . . protected by the Due Process Clause . . . which [could] not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Id*. at 573-74. The Court dealt with a 10-day suspension—a "total exclusion from the educational process"—and did not specifically define those protections. *Id.* at 576.

2. **School District Defendants' Arguments**

The School District Defendants argue that Count Five fails to adequately allege that Principal Anderson, Superintendent Lockhart, or the Board members "personally committed conduct that violated J.S.'s constitutional rights" and that "[t]his defect is fatal." Aplt. Br. at 24.

On prong one of qualified immunity—constitutional violation—they argue that Count Five "does not identify any . . . deprivation" of "a constitutionally protected liberty or property interest." *Id.* at 29. They acknowledge that "[p]ublic school students have a recognized property interest in continued enrollment, but not in

specific educational placements, teacher assignments, or participation in extracurricular activities." *Id.* (citing *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998)).

On prong two of qualified immunity—clearly established law—the School District Defendants argue that the district court erred in relying on *Goss*. That case, they argue, involved "a situation where there was a complete and involuntary deprivation of education," but that "is not what occurred under the facts of this case." *Id.* Although the SAC alleged that "J.S. was removed from McClain's class, placed on a modified schedule, and eventually withdrawn by his parents," they note there is no allegation "that the school expelled him, suspended him, or deprived him of enrollment." *Id.* at 29-30.

3. **Analysis**

There is no dispute that J.S. is entitled to a public education,[5] "a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct [or other reasons] without adherence to the minimum procedures required by that Clause." *Goss*, 419 U.S. at 574. A child's "total exclusion from the educational process for more than a trivial period . . . is a serious

---

[5] *See Goss*, 419 U.S. at 573 (holding that class action plaintiffs, who were challenging student suspensions without a hearing, "plainly had legitimate claims of entitlement to a public education"); Okla. Const. art. 1, § 5 ("Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all of the children of the state . . . ."); Okla. Const. art. 13, § 1 ("The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated.").

event in the life of [that] . . . child." *Id.* at 576. "The Due Process Clause also forbids arbitrary deprivations of liberty." *Id.* at 574. Thus, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Id.* (quotations omitted).

### a. *Personal participation*

We agree with the School District Defendants that the SAC fell short in alleging their personal participation in J.S.'s removal from school: "[O]n August 29, 2022, and in response to Plaintiffs' report of harassment, *TPSD* removed J.S. from the classroom and sent him home." App. Vol. I at 43 (emphasis added). Although the SAC alleged J.S. was removed from school and sent home in response to the Stepps' harassment report, it failed to implicate the individual defendants in J.S.'s removal. Thus, the portion of the procedural due process claim that was allegedly based on J.S.'s removal from school without process should have been dismissed for failure to state a claim against these defendants on this ground.

We do not address whether the SAC adequately alleged personal participation as to the procedural due process claim based on the sex-segregation policy. We need not do so because, as concluded below, the Stepps have not shown the individual Defendants are not entitled to qualified immunity under clearly established law.

23

b. *Qualified immunity*

i. Constitutional violation

Apart from J.S.'s removal from the school, the Stepps argue a procedural due process violation based on the individual Defendants' "approv[al] and enforc[ement of] an obviously unconstitutional policy of sex-based segregation of public-school students, despite Plaintiffs' complaints," Aplee. Br. at 32. They contend that "once [Defendants] closed their Title IX 'investigation,' the only options available for J.S.'s education were to continue suffering sex- and gender-based abuse in McClain's all-boys room . . . or to forego any meaningful educational opportunity at the free public school in his district." *Id.* at 33.

At prong one of qualified immunity, whether the Stepps have adequately alleged that the Defendants deprived J.S. of a public education under *Goss* is not clear. *See Couture v. Bd. of Educ.*, 535 F.3d 1243, 1257 (10th Cir. 2008) (stating that *Goss* "did not . . . delineate the precise contours of those protections"). First, even after the investigation ended, J.S. returned to school, and by then TES had pulled back from the sex-segregation policy. After Mr. Blair required J.S. to sit on the classroom floor and berated the Stepps at the basketball game, and based on the other events leading up to this point, the Stepps understandably pulled their children from the school. But because TES did not suspend or impose a "total exclusion" on J.S., as happened in *Goss*, 419 U.S. at 576, the question is whether the alleged facts amounted to a procedural due process deprivation "of the right to attend school."

24

*Al-Turki v. Tomsic*, 926 F.3d 610, 617 (10th Cir. 2019); *see Paul v. Davis*, 424 U.S. 693, 710 (1976).

Even if it was, the SAC failed to identify what process J.S. should have been afforded. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("[T]he deprivation by state action of a constitutionally protected interest . . . is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*.").

Rather than determine whether the SAC adequately alleged a procedural due process violation, we choose to resolve the qualified immunity issue at prong two. *See Doe*, 912 F.3d at 1289.

### ii. Clearly established law

The Stepps have not shown a violation of clearly established law. They cite four cases that are not on point.

First, *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982), concerned an equal protection challenge to a nursing school's single-sex admissions policy, not a procedural due process claim. *Id.* at 723.

Second, in *Zinermon* the plaintiff alleged that a group of physicians, administrators, and staff members at a Florida hospital deprived him of his liberty without due process by admitting him as a "voluntary" mental patient when he was incompetent to give informed consent. 494 U.S. at 114-15.

Third, in *Couture*, the plaintiff was a first-grader who suffered from severe emotional and mental health problems that "manifested themselves in repeated

outbursts in which he threatened, and at times assaulted, teachers and students."
535 F.3d at 1246. We held that a behavior management system permitting teachers
to place the plaintiff in supervised timeouts when his behavior became disruptive was
not a procedural due process violation. *Id.* at 1257. We noted that "[w]hile [the
plaintiff was] temporarily removed from the classroom, any loss of a property right
[wa]s de minimis and not subject to procedural protections." *Id.*

Fourth, in *Goss* the Supreme Court "dealt only with the specific factual
scenario of a 10-day suspension constituting 'total exclusion from the educational
process.'" *Id.* (quoting *Goss*, 419 U.S. at 576). "When complete deprivation of
education occurs, such as when a student is removed from the school for a lengthy
time period, the Court ruled that the student at minimum is entitled to 'notice and . . .
some kind of hearing.'" *Id.* (quoting *Goss*, 419 U.S. at 579).

*Goss* might serve as the clearly established law for the portion of the Stepps'
procedural due process claim that is based on J.S.'s removal from school. But, as
noted above, that portion of the claim should have been dismissed due to the SAC's
failure to identify which persons were responsible for J.S.'s removal. And because
the segregation policy was not a "total exclusion," *Goss* does not provide clearly
established law for the other portion of plaintiffs' procedural due process claim.

\*   \*   \*   \*

In sum, the procedural due process claim asserted in Count Five of the SAC
should have been dismissed because (a) the SAC failed to adequately allege that any
of the individual Defendants participated in J.S.'s removal from school, and (b) on

26

the portion of the claim based on implementation of the sex-based segregation policy, the Stepps failed to show a procedural due process violation based on clearly established law.

### B. *Count Five – Equal Protection*

Count Five of the SAC alleged that Principal Anderson, Superintendent Lockhart, and the individual Board members violated J.S.'s equal protection rights, depriving him of his right to a free public education, "[b]y adopting, implementing, and enforcing a policy of segregation based on sex in [TES's] fifth grade program." App. Vol. I at 64-65.

### 1. **Legal Background**

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

"[C]ourts must evaluate sex-based classifications under intermediate scrutiny." *Doe ex rel. Doe v. Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1259 (10th Cir. 2024). To survive intermediate scrutiny, the government defendant must provide an "exceedingly persuasive" justification for the sex-based classification, and that classification must serve "important governmental objectives" through means

27

"substantially related to" achieving those objectives. *United States v. Virginia*, 518 U.S. 515, 524 (1996) (quotations omitted).

## 2. School District Defendants' Arguments

Defendants argue the equal protection claim in Count Five "is replete with generalized and conclusory allegations, but . . . lacks specific factual content showing that any individual defendant personally committed conduct that violated J.S.'s constitutional rights." Aplt. Br. at 24.

On prong one of qualified immunity, they argue that the equal protection claim is "unsupported by allegations of purposeful discrimination," *id.* at 28 (capitalization omitted), because the SAC "fails to allege that any [individual School District] defendant acted with discriminatory intent or treated J.S. differently because of his sex," *id*. at 28. Defendants also argue that the Stepps "admit the [sex segregation] policy applied equally to both sexes." *Id.*

As for prong two clearly established law, Defendants argue that *Hogan*, one of the Supreme Court cases the Stepps relied on, "does not clearly establish that the classroom arrangement at issue here is unconstitutional," stating that *Hogan* "was expressly limited to the higher education context and turned on the State's failure to show that the exclusion furthered an important government interest through substantially related means." Aplt. Br. at 34. "By contrast," they say "the classroom configuration in this case involved a temporary administrative assignment of third-grade [sic] students to same-sex classrooms, all within the same public elementary school, with access to the same curriculum and comparable instruction."

28

*Id.* They note "[t]here is no allegation that either boys or girls were excluded from educational opportunities, denied access to resources, or subjected to inferior treatment," or "that the policy was grounded in gender stereotypes or discriminatory intent." *Id.* at 34-35.

Finally, citing *Doe v. Wood County Board of Education*, 888 F. Supp. 2d 771, 778-79 (S.D. W.Va. 2012), Defendants argue that "[c]ourts have recognized that single-sex classroom groupings in public schools are not inherently unconstitutional, provided that students retain equal access to educational opportunities and are not subject to discriminatory intent." Aplt. Br. at 35.

3. **Analysis**

a. *Personal participation*

The School District Defendants' lack-of-personal-participation argument lacks merit. The SAC alleged that TES "implemented [the] policy providing for the separation of fifth grade students . . . based on their sex" "at the direction of . . . Lockhart and Anderson." App. Vol. I at 31. It identified each Board member by name and alleged that each was "responsible for the governance and administration of TPDS." *Id.* at 29-30. It further alleged that the Board members "were aware of this policy and either explicitly or tacitly approved of the same," *id.* at 32, and that they "adopt[ed], implement[ed], and enforc[ed] a policy of segregation based on sex at [TES's] fifth grade program," *id.* at 64. The SAC also alleged that on September 6, 2022, the Stepps attended a public board meeting and "presented to the Board their concerns with . . . [the] ongoing policy of sex segregation." *Id.* at 46. The "Board Members heard

29

[that] presentation but asked no questions, made no comments, . . . offered no solutions," and, "after the meeting, declined to take any action or vote concerning" the sex-segregation policy. *Id.*

Based on these allegations, and "[m]ak[ing] all reasonable inferences in favor of the non-moving party," *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017), we conclude the SAC adequately pled the individual Defendants' participation in the alleged equal protection violation. It supports personal and supervisory liability for Superintendent Lockhart and Principal Anderson because they directed the implementation and continuation of the policy. It also plausibly pled supervisory participation against the Board members for their approval, implementation, and continuation of a policy that discriminated based on sex. *See Dodds*, 614 F.3d at 1196.

b. *Qualified immunity*

i. Constitutional violation

We conclude the SAC plausibly alleged an equal protection violation based on the sex segregation policy. The policy classified fifth-grade students on the basis of sex and thus is "subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Hogan*, 458 U.S. at 723. It is subject to intermediate scrutiny, meaning Defendants must provide an "exceedingly persuasive justification for [the] classification." *Virginia*, 518 U.S. at 524 (quotations omitted). The SAC alleged that "[u]nderpinning Defendants' decision to segregate [TES's] fifth grade class based on sex were offensive and outdated stereotypes about boys and girls, their

behavior, and the discipline and instruction permissible for or required for each."

App. Vol. I at 32. The SAC further alleged that "Defendants had no legitimate basis,

at law or in fact, to implement a policy of sex segregation at [TES]." *Id.* The SAC

also alleged that defendants acted "knowingly, intentionally, and/or recklessly" in

"adopting, implementing, and enforcing" the sex-segregation policy. *Id.* at 64-65.

Thus, we conclude the SAC stated a viable equal protection challenge.

### ii. Clearly established law

We also conclude that the violation was one of clearly established law.

The Stepps first cite *Hogan*, an adult male's challenge to a Mississippi "state

statute that exclude[d] males from enrolling in a state-supported professional nursing

school." 458 U.S. at 719. Applying intermediate scrutiny, the Court concluded the

policy was "invalid . . . because . . . the State . . . made no showing that the

gender-based classification [wa]s substantially and directly related to its proposed

compensatory objective." *Id.* at 730. The Stepps have not, however, shown how

*Hogan* could place reasonable individuals in Defendants' positions in this case on

notice that the sex-segregation policy at TES was unconstitutional.[6]

---

[6] The Stepps also rely on *Escue v. Northern Oklahoma College*, 450 F.3d 1146 (10th Cir. 2006), and *Starrett v. Wadley*, 876 F.2d 808 (10th Cir. 1989), but those cases are factually distinguishable because both involved sexual harassment claims. *Escue* concerned a female college student who alleged that her professor sexually harassed her. 450 F.3d at 1149. *Starrett* involved a female county employee who alleged that her male supervisor sexually harassed her. 876 F.2d at 811.

They fare better with *United States v. Virginia*, an equal protection challenge brought by the United States against the Virginia Military Institute (VMI), a state-sponsored military college that admitted only men. 518 U.S. at 519. In response to a lower-court ruling, the State of Virginia "proposed a parallel program for women: Virginia Women's Institute for Leadership (VWIL)." *Id.* at 526. "Although VWIL would share VMI's mission" of producing "citizen-soldiers," "the VWIL program would differ . . . from VMI in academic offerings, methods of education, and financial resources." *Id.*

Applying intermediate scrutiny, the Court "conclude[d] that Virginia ha[d] shown no 'exceedingly persuasive justification' for excluding all women from the citizen-soldier training afforded by VMI" and therefore "had violated the Fourteenth Amendment's Equal Protection Clause." *Id.* at 534. The Court also held that "the remedy proffered by Virginia," i.e., the VWIL program, "d[id] not cure the constitutional violation." *Id.* It said "that Virginia ha[d] not shown substantial equality in the separate educational opportunities the [State] support[ed] at VWIL and VMI." *Id.* at 554. Thus, "Virginia's remedy d[id] not match the constitutional violation." *Id.* at 555-56.

Although *Virginia* involved college rather than elementary students, it concerned an educational setting and made clear that separate and differential opportunities for women violated the Equal Protection Clause. Defendants in this action argue that the educational opportunities provided to fifth-grade girls at TES were the same as for fifth-grade boys, Aplt. Br. at 34 (arguing that all fifth-graders at

32

TES had "access to the same curriculum and comparable instruction"), but the SAC alleged otherwise—that the segregation policy was "based on . . . offensive and outdated stereotypes about boys and girls, their behavior, *and the discipline and instruction permissible for or required for each*." App. Vol. I at 32 (emphasis added).

Along with *Virginia*, the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), would have placed reasonable persons in the positions of Principal Anderson, Superintendent Lockhart, and the Board members on notice that the sex-segregation policy was unconstitutional.[7] The question presented in *Brown* was: "Does segregation of children in public schools solely on the basis of race, even though physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" *Id.* at 493. The Supreme Court held "it does," *id.* at 493, "conclud[ing] that in the field of public education the doctrine of 'separate but equal' has no place" because "[s]eparate educational facilities are inherently unequal," *id.* at 495.[8] This landmark

---

[7] Although the Stepps did not cite to *Brown*, "we are not restricted to the cases cited by them." *Cortez v. McCauley*, 478 F.3d 1108, 1122 n.19 (10th Cir. 2007) (en banc). "[O]nce the plaintiffs urged a clearly established right . . . , we incurred an obligation to conduct our own legal research to determine the clarity of a constitutional violation." *Love v. Grashorn*, 134 F.4th 1109, 1117 (10th Cir. 2025); *see also Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("A court engaging in review of a qualified immunity judgment should therefore use its full knowledge of its own [and other relevant] precedents." (quotations omitted)). The same point applies to other cases we cite in this opinion.

[8] *Doe*, the district court case cited by Defendants, involved a West Virginia middle-school that had adopted a single-sex education program. 888 F. Supp. 2d

"'[g]eneral statement[] of the law' can clearly establish a right for qualified immunity purposes if [it applies] 'with obvious clarity to the specific conduct in question.'" *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

In sum, plaintiffs have met their burden to show the School District Defendants are not immune from the equal protection claim alleged in Count Five. We therefore affirm the district court's denial of qualified immunity to Principal Anderson, Superintendent Lockhart, and the Board members on that claim.

## C. *Counts Six and Nine - Retaliation*

Count Six of the SAC alleged a First Amendment retaliation claim. It alleged that Principal Anderson, Mr. Blair, and Mr. Bryant retaliated against the Stepps for filing a formal Title IX complaint, participating in the Title IX grievance process, and speaking at the public board meeting. Count Nine alleged a similar § 1983 retaliation claim against Superintendent Lockhart and the Board members.

### 1. **Legal Background**

"[T]he First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected

---

at 773. The plaintiffs, a mother and her three daughters who attended the school, alleged equal protection and Title IX violations. *Id.* at 774. The court addressed the plaintiffs' motion for preliminary injunction and did "not decide the question of whether single-sex classes violate the Equal Protection Clause" (it instead granted the preliminary injunction in part on the basis of the Title IX claim). *Id.* at 777. Thus, *Doe* does not support either parties' position in this case (and, in any event, it is a district court case from a different circuit).

speech." *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).[9]  To state a First Amendment retaliation claim, a plaintiff must allege facts showing "(1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotations omitted).

Defendants in their motion to dismiss challenged only the second element.

## 2.  **School District Defendants' Arguments**

Defendants argue the SAC failed to adequately allege that Principal Anderson, Mr. Blair, Mr. Bryant, Superintendent Lockhart, and the Board members personally participated in the alleged retaliation.  Although they concede the SAC alleged these defendants were made aware of Mr. McClain's conduct, they argue that "mere awareness and administrative involvement in a Title IX investigation do not equate to a violation of . . . Title IX-related retaliation law."  Aplt. Br. at 23.

As to Principal Anderson, Defendants contend that "*verbal criticisms* or identifying a complainant do not constitute *materially adverse actions* sufficient to sustain a First Amendment . . . retaliation claim under clearly established law."  *Id.*

---

[9] The First Amendment applies to the States through the Fourteenth Amendment.  *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 470 (2025).

at 38.  They argue that Principal "Anderson's alleged disclosure of Plaintiffs'

identities and . . . Blair's alleged statements at a basketball game were . . . isolated

verbal encounters, not actions that would chill a person of ordinary firmness." *Id.*

at 23-24.  Further, they assert that "Plaintiffs allege no ongoing pattern of adverse

conduct, and they continued to engage in advocacy and public comment." *Id.* at 39.

As to Mr. Blair, Defendants argue that the claim against him "is based solely

on an alleged verbal altercation with Mr. Stepp at a school basketball game," and

"such isolated verbal outbursts do not constitute constitutionally cognizable

retaliation." *Id.*  "Moreover," they argue, "Plaintiffs do not plausibly allege that

Blair's alleged comments caused any adverse action against J.S. or chilled their

participation in the Title IX process." *Id.* at 40.[10]

3.  **Analysis – Qualified Immunity**

a.  *Personal participation*

We agree with the School District Defendants that the SAC failed to

adequately allege personal participation as to Mr. Bryant, Superintendent Lockhart,

and the Board members.  Although the SAC alleged that these defendants were aware

of the Stepps' First Amendment activities, it failed to allege they engaged in

---

[10] Defendants also argue "[t]here is no plausible allegation that" the Board members "acted with purpose to . . . retaliate." Aplt. Br. at 40-41.  Because the Board members did not make this argument below, *see* App. Vol. I at 177-78 (challenging only the second element of the plaintiffs' retaliation claim), it is waived for purposes of appeal.  *See City of Ft. Collins v. Open Int'l, LLC*, 146 F.4th 929, 941-42 (10th Cir. 2025).

retaliatory conduct.  The retaliation claim asserted against Mr. Bryant in Count Six and against Superintendent Lockhart and the Board members in Count Nine therefore should have been dismissed.

We reach a different conclusion as to Principal Anderson and Mr. Blair, as explained in the ensuing discussion of the SAC's allegations about their actions in response to the Stepps' constitutionally protected activity.

b. *Qualified immunity*

i. Constitutional violation

We conclude that the SAC sufficiently alleged the second element of the retaliation claim against Principal Anderson and Mr. Blair.  It alleged that Principal Anderson, in response to parents' questions about why TES decided in early October 2022 to modify its fifth-grade sex-segregation policy, "named J.S. to the inquiring parents, blaming Plaintiffs in order to deflect other parents' aggravations with [TES] and McClain."  App. Vol. I at 52 (emphasis omitted).  The SAC also alleged that Principal "Anderson, in these conversations, apparently pressed her view that Plaintiffs' allegations against McClain were unsubstantiated and lamented that Plaintiffs had continually pressed OSDE for action, thus causing otherwise unwanted disruptions to other students' schedules." *Id.*

As for Mr. Blair, the SAC alleged that when J.S. returned to TES following his removal, Mr. Blair retaliated by requiring him to sit on the classroom floor even though the other students were seated on chairs and at desks. *Id.* at 53.  The SAC also alleged that Mr. Blair verbally assaulted and threatened to physically assault the

37

Stepp family at a school-sponsored basketball game and that "Plaintiffs . . . did not feel safe around Blair after this confrontation and worried about his threats." *Id.* at 53-54.

The SAC alleged that "Plaintiffs . . . determined that they were not welcome at TPSD or its public functions and could not, in the future, safely report any issues of sexual harassment or bullying, even if true." *Id.* at 55. It alleged that the Defendants' retaliatory conduct "would chill a person of ordinary firmness . . . from ever again filing a grievance of any kind with or concerning [TES], its officials, or its employees." *Id.* at 72.

These allegations were sufficient to satisfy the second element of the retaliation claim against Principal Anderson and Mr. Blair.

### ii. Clearly established law

To overcome qualified immunity for Principal Anderson and Mr. Blair, the Stepps still must show they violated clearly established First Amendment retaliation law. In their response to the Defendants' motion to dismiss, the Stepps cited *Gonzales v. Hernandez*, 4 F. App'x 743 (10th Cir. 2001) (unpublished), App. Vol. I at 258, but "[i]n determining whether the law was clearly established, . . . we may not rely upon unpublished decisions." *Green v. Post*, 574 F.3d 1294, 1305 n.10 (10th Cir. 2009). Unpublished cases may at most be "supportive" of the plaintiffs' alleged claim. *Krueger v. Phillips*, 154 F.4th 1164, 1208 n.27 (10th Cir. 2025).[11]

---

[11] *Gonzales* involved a female psychologist who had filed an unsuccessful national origin discrimination charge against her employer. 4 F. App'x at 745. She

The district court appears to have relied on our *Worrell* decision for the clearly established law applicable to Count Six. App. Vol. II at 66. The plaintiff in *Worrell*, a former FBI agent and private investigator, alleged that the defendant, a state district attorney, rescinded a job offer to the plaintiff after learning he had testified on behalf of a capital murder defendant who was convicted of murdering an agent of the Oklahoma Bureau of Narcotics and Dangerous Drugs. 219 F.3d at 1200-02. The plaintiff alleged a § 1983 First Amendment retaliation claim. *Id.* at 1200, 1203. The district court granted summary judgment in favor of defendant and the plaintiff appealed. *Id.* at 1203. We reversed, determining that a reasonable jury could find for the plaintiff, including on the second element that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity. *Id.* at 1212.

*Worrell* made the contours of the right to be free from retaliation sufficiently clear, despite its factual differences from the case at hand, so that Principal Anderson

---

later sued under § 1983, alleging that the employer retaliated against her in violation of her First Amendment rights. *Id.* We concluded the "complaint sufficiently allege[d] facts that, if proven, would constitute a First Amendment retaliation claim." *Id.* at 747-49. The complaint alleged that plaintiff "exercised her First Amendment right to speak by filing a complaint with the New Mexico Human Rights Commission alleging national origin discrimination" and that the defendants "refused to allow [her] to participate in the crisis hot line in retaliation for [her] exercise of her First Amendment rights." *Id.* at 747. Although *Gonzales* is factually distinguishable from this case because it occurred in a public employment setting, it supports the Stepps' claim because it makes clear that filing a civil rights complaint may be the predicate for a retaliation claim.

and Mr. Blair would have understood that their actions were violative of that right.

As we said in *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022),

> In *Worrell* we described the objective retaliation element as actions causing injury that would chill a person of ordinary firmness from continuing to engage in protected activity. Although this is a general statement of the law, it can supply clearly established law here because it applies with obvious clarity to the specific conduct in question.

*Id.* at 1296-97 (quotations omitted) (holding police interference with filming a traffic stop a clearly established constitutional violation).

We also take note of two longstanding decisions in the school context that contribute to clearly established law. First, in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Supreme Court held that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506. So long as a student's private speech does not "intrude[] upon the work of the school[] or the rights of other students," they may not be punished for that speech. *Id.* at 508.

Second, in *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996), a high school student and his parents asserted that defendant school officials "violated their First Amendment right to freedom of speech by discouraging them from making statements to the press about [a football team hazing] incident, and by removing [the student] from the football team because he refused to apologize for informing authorities of the incident." *Id.* at 1236. We concluded the student "properly state[d]

40

a claim that his speech [wa]s entitled to First Amendment protection" under *Tinker* and that it was improper for defendants to punish him for that speech. *Id.* at 1237-38.

The SAC alleged that Principal Anderson publicly shamed the Stepps and Mr. Blair punished J.S., upon his return to TES, in retaliation for the Stepps exercising their First Amendment rights to complain about the sex-segregation policy and Mr. McClain's conduct. *Worrell*, *Tinker*, and *Seamons*, show a First Amendment infringement happened here. "Even without prior case law on point," school officials should be "on reasonable notice" that punishing a fifth-grade student and publicly blaming the parents for ending sex-segregated classes because they complained about a teacher's abusive treatment of their child is unconstitutional conduct. *See Cortez v. McCauley*, 478 F.3d 1108, 1118-19 (10th Cir. 2007) (en banc).

\*     \*     \*     \*

In sum, we conclude the district court properly denied Defendants' motion to dismiss Count Six of the SAC as to Principal Anderson and Mr. Blair but erred in failing to grant Defendants' motion to dismiss Count Six as to Mr. Bryant and Count Nine as to Superintendent Lockhart and the Board members.

### D.  *Count Seven - Conspiracy*

Count Seven of the SAC alleged that all of the "Defendants, acting in concert, deprived . . . J.S. of his constitutional rights under the Fifth and Fourteenth Amendments." App. Vol. I at 69.  It further alleged that "Defendants entered into an agreement intended to deprive Plaintiffs of their constitutional rights," including

41

"J.S.'s Fifth and Fourteenth Amendment rights to equal protection, procedural and substantive due process, and to be free from discrimination based on sex." *Id.*

The School District Defendants argued in their motion to dismiss the SAC that these allegations were too vague to satisfy the "heightened pleading requirements" that applied to the conspiracy claim. *Id.* at 178-79. They did not expressly argue they were entitled to qualified immunity.

The district court concluded the Count Seven allegations were sufficient to state a claim against the School District Defendants, except for Mr. Blair and Mr. Bryant. As to those two defendants, the district court concluded the SAC "failed to plausibly allege" that they "deprived [plaintiffs] of any constitutional rights." App. Vol. II at 73. The district court therefore dismissed Count Seven against Mr. Blair and Mr. Bryant.[12]

On appeal, the School District Defendants argue the district court "failed to conduct any qualified immunity analysis with respect to" the Count Seven conspiracy claim. Aplt. Br. at 41. They further argue that "[a] plaintiff cannot defeat qualified immunity merely by alleging a conspiracy; they must plead an actual underlying constitutional violation and allege specific facts showing an agreement among the defendants to commit it," and "Plaintiffs failed to do so." *Id.* Finally, they argue that "[b]ecause the conspiracy allegations are conclusory and unsupported by plausible

---

[12] Because Plaintiffs did not appeal the district court's dismissal of Count Seven against Mr. Blair, we do not address whether Count Seven alleged a viable conspiracy claim against him.

facts, and . . . because no underlying constitutional violation is adequately pled, the individual defendants are entitled to qualified immunity on Count Seven as a matter of law." *Id.*

Despite these arguments, Defendants do not challenge that the district court limited its analysis to whether Count Seven alleged a plausible claim against the School District Defendants. And, as noted, Defendants did not challenge Count Seven based on qualified immunity. They argued only that Count Seven failed to state a claim upon which relief could be granted.[13] We thus lack interlocutory jurisdiction over the district court's ruling on Count Seven.

### III. **DISCUSSION – DEFENDANT McCLAIN – APPEAL NO. 25-7039**

On appeal, Mr. McClain argues the district court erred in denying him qualified immunity on (1) the Count Four substantive due process claim, and (2) the Count Four equal protection claim. We agree on the former and disagree on the latter.

#### A. *Count Four – Substantive Due Process*

Count Four alleged that Mr. McClain "deprived J.S. of rights, privileges, and immunities secured by the Fifth and Fourteenth Amendments, including J.S.'s clearly established right[] to . . . substantive due process . . . ." App. Vol. I at 63.

---

[13] *See Ashaheed v. Currington*, 7 F.4th 1236, 1251 n.15 ("Although the district court addressed qualified immunity on the free exercise claim (albeit only as to the second element), the court did not address qualified immunity on the equal protection claim. We therefore decline to reach this issue.").

1. **Legal Background**

The Supreme Court recognizes two types of substantive due process claims:
(1) claims that the government has infringed a "fundamental" right, *see, e.g.*,
*Washington v. Glucksberg*, 521 U.S. 702, 720-22 (1997) (assessing asserted right to
assisted suicide); and (2) claims that government action deprived a person of life,
liberty, or property in a manner so arbitrary it shocks the judicial conscience,
*see, e.g.*, *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (examining a
high-speed police chase). "[W]e apply the fundamental-rights approach when the
plaintiff challenges *legislative action*, and the shocks-the-conscience approach when
the plaintiff seeks relief for tortious *executive action*." *Halley,* 902 F.3d at 1153.
The Stepps' substantive due process claim challenges executive action, *see id.*
at 1154, and therefore is a "shocks the conscience" claim.

Executive action that shocks the conscience requires much more than
negligence. *See Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006). Even the
actions of a reckless official or one bent on injuring a person do not necessarily shock
the conscience. *Id.* "Conduct that shocks the judicial conscience" is "deliberate
government action that is arbitrary and unrestrained by the established principles of
private right and distributive justice." *Hernandez v. Ridley*, 734 F.3d 1254, 1261
(10th Cir. 2013) (quotations omitted). "To show a defendant's conduct is conscience
shocking, a plaintiff must prove a government actor arbitrarily abused his authority
or employed it as an instrument of oppression." *Id.* (brackets omitted) (quotations
omitted). "The behavior complained of must be egregious and outrageous." *Id.* The

Supreme Court found conscience-shocking behavior in a case involving a sheriff's application of stomach pumping to force vomiting, *Rochin v. California*, 342 U.S. 165, 172 (1952). This Circuit found a social worker's actions that led to physical and sexual abuse of a minor shocked the conscience. *T.D. v. Patton*, 868 F.3d 1209, 1213 (10th Cir. 2017).

When deciding whether conduct shocks the conscience, "we must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope, (2) the concern that § 1983 not replace state tort law, and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (citations omitted).

2. **Defendant McClain's Arguments**

Mr. McClain argues the SAC's allegations failed to allege a substantive due process claim. He notes that "the standard for judging a substantive due process claim is whether the challenged government action would shock the conscience of federal judges," which requires a plaintiff to "demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Aplt. Br. at 42-43 (quotations omitted).

Mr. McClain points to *Abeyta v. Chama Valley Independent School District No. 19*, 77 F.3d 1253 (10th Cir. 1996), where this court concluded that the defendant teacher's calling the plaintiff a prostitute in class was insufficient to state a substantive due process claim. Aplt. Br. at 44. He also points to similar case law

45

from the Third and Eighth Circuits, as well as district court decisions from in and outside the Tenth Circuit. *Id.* at 44–45. He argues the SAC allegations "are directly comparable to the misdeeds at issue in" *Abeyta* and the other cases. *Id.* at 45. He asserts the district court properly "referenced the 'shocks the conscience' standard," but "then, without further discussion, found the standard met here." *Id.* at 46.

Mr. McClain also argues the district court failed to analyze the clearly established prong, and the law was otherwise not clearly established. Aplt. Br. at 46-47. Mr. McClain posits that the Stepps have failed to point to any Tenth Circuit or Supreme Court precedent for clearly established law and that *Abeyta* supports his position. *Id.* at 47.

### 3. Analysis – Qualified Immunity

The district court concluded that the SAC stated a plausible § 1983 substantive due process claim against Mr. McClain. It cited *Abeyta*, stating that "[t]he Tenth Circuit has . . .recognized that psychological abuse alone can violate substantive due process protections, and that 'matters relating to marriage, family, procreation, and the right to bodily integrity' are generally considered to implicate substantive due process rights." App. Vol. II at 18 (quoting *Abeyta*, 77 F.3d at 1257). As Mr. McClain notes on appeal, the district court did not address whether the alleged violation was one of clearly established law.

The plaintiff in *Abeyta* was "a twelve-year-old female student whose teacher allegedly called her a prostitute in front of the class and continued to call her that over a month-and-a-half period." 77 F.3d at 1254. She sued under § 1983, alleging

46

the teacher violated her "substantive due process rights to be free from invasion of her personal security by sexual abuse and harassment and by psychological abuse." *Id*. The district court denied the defendant's motion for summary judgment that asserted qualified immunity. *Id.* at 1255.

On appeal, this court reversed. Although we said the defendant's alleged behavior was "flagrant misconduct," we concluded that plaintiff's claims did "not state an actionable § 1983 claim against defendant based on the substantive due process violation alleged." *Id.* at 1258. Noting there were no allegations of physical abuse, we said we could "imagine a case where psychological harassment might be so severe that it would amount to torture equal to or greater than the stomach pumping abuse condemned [by the Supreme Court] in *Rochin*." *Id.* "But," we noted, "we are sure that the actions alleged in the instant case do not reach that level— whether they were done with indifference or with deliberate intent to cause psychological harm." *Id.*

Mr. McClain's alleged misconduct was arguably at least as "flagrant" as that alleged in *Abeyta*. But even assuming the SAC plausibly pled a substantive due process violation, the Stepps have not met their burden to show a violation under clearly established law. Their reliance on *Abeyta*, *Seegmiller v. LaVerkin City*, 528 F.3d 762 (10th Cir. 2008), *Saucier v. Katz*, 533 U.S. 194 (2001), and *Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022), Aplee. Br. at 55, falls short.

*Abeyta*, as noted, involved a teacher who was verbally abusive to a minor student. We acknowledged that psychological harassment could violate substantive

47

due process, but we did not define the scope of the constitutionally prohibited conduct. And we concluded the plaintiff did "not state an actionable § 1983 claim against [the] defendant based on the substantive due process violation alleged." 77 F.3d at 1258. For clearly established law, the plaintiff must identify a case where the government defendant acting under similar circumstances was held to have committed a constitutional violation. *See Heard v. Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022). For these reasons, *Abeyta* cannot serve as the clearly established law applicable to this case.

*Seegmiller*, *Saucier*, and *Bledsoe* are too factually dissimilar to serve as the clearly established law. *Seegmiller* involved a female police officer who filed suit against a city and city manager based on their decision to reprimand her for off-duty sexual conduct. 528 F.3d at 764. *Saucier* concerned a demonstrator who was arrested by a military police officer after he attempted to unfurl a banner at a public event where the Vice President of the United States was speaking. 533 U.S. at 197-98. And in *Bledsoe*, the defendants allegedly fabricated testimony and other false evidence implicating plaintiff in a murder. 53 F.4th at 612. None of these cases would have placed a reasonable teacher in Mr. McClain's position on notice that his conduct was unconstitutional.

Because plaintiffs have failed to satisfy their burden of showing that the law was clearly established at the time of Mr. McClain's conduct, he was entitled to qualified immunity on the Count Four substantive due process claim against him.

B. *Count Four – Equal Protection*

The Stepps' Count Four equal protection claim against Mr. McClain was based on the allegation that Mr. McClain's conduct "was sufficiently severe and pervasive to create a hostile learning environment for J.S. and otherwise deprive J.S. of fair and equitable access to a public education." App. Vol. I at 64.

1. **Legal Background**

The legal background discussion presented earlier on the equal protection claim against the School District Defendants also applies to the claim against Mr. McClain. In addition, we have recognized that "sexual harassment constitutes sex discrimination under our jurisprudence." *Shepherd v. Robbins*, 55 F.4th 810, 817 (10th Cir. 2022). "So a state actor violates the Equal Protection Clause of the Fourteenth Amendment when he commits sexual harassment." *Id.*

"A brief look into [Tenth Circuit] § 1983 sexual harassment caselaw shows [this court] ha[s] focused [its] inquiry on the context in which the conduct occurred." *Id.* at 818. "When [this court] first addressed this issue, [it] concluded that sexual harassment can violate the Equal Protection Clause in a governmental employment setting." *Id.* This court "then specified that such a claim existed for subordinates against their supervisors in government positions." *Id.* "And from there, [this court] explained that private citizens could also bring an equal-protection sexual-harassment claim when a state agent exercised governmental authority over them." *Id.* "We later extended the claim to the educational context involving claims by students against teachers." *Id.* at 818-19. "So the cases in which [this court] ha[s] found

sexual-harassment-based constitutional violations under § 1983 involved a power imbalance created by the alleged harasser's governmental authority." *Id.* at 819.

### 2. **Defendant McClain's Arguments**

Mr. McClain argues "that J.S.'s lack of understanding of the nature of McClain's alleged comments precluded a hostile environment harassment claim." Aplt. Br. at 49. He argues that under *Escue v. Northern Oklahoma College*, 450 F.3d 1146, 1157 (10th Cir. 2006), "a hostile environment harassment claim within the educational context requires a showing that the defendant's conduct was unwelcome, which necessarily implies that the plaintiff must be both aware of the conduct and perceive it as negative." Aplt. Br. at 49 (citations and quotations omitted). He adds that "[a]ccording to the [SAC], J.S. was **not** aware of the nature of McClain's alleged comments while at school," and "[i]t was not until his father explained the nature of the comments that J.S. could have perceived any sexual aspect to them." *Id.* (citations omitted).[14]

Mr. McClain further contends that even if the SAC adequately alleged an equal protection claim, "the unusual facts of this case render the law far from clearly established." *Id.* at 50 (capitalization omitted).

---

[14] The SAC (¶ 51) alleged that "J.S. reported that he had learned these terms from Mr. McClain and that he did not really understand their meaning," and (¶ 52) that Mr. Stepp "explained the words [that Mr. McClain used] to J.S., who immediately began to cry." App. Vol. I at 36.

3.  **Analysis – Qualified Immunity**

   a.  *Constitutional violation*

The district court correctly found that the SAC plausibly alleged an equal protection claim against Mr. McClain.

Contrary to Mr. McClain's contention, *Escue* provides no support for his position that "J.S.'s lack of understanding of the nature of McClain's alleged comments precluded a hostile environment harassment claim." Aplt. Br. at 49. In *Escue*, a female college student alleged that, during a single semester when she was enrolled in two classes taught by the defendant professor, he "touched her inappropriately without her consent on multiple occasions and made numerous sexual comments, some about her in front of her peers, and others to her while they were alone." 450 F.3d at 1149. We noted that "[t]he Supreme Court has observed that 'the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact.'" *Id.* at 1157 (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68 (1986)). *Escue* did not address whether a minor victim of alleged sexual harassment must understand the nature and meaning of the teacher's comments to state a claim.

In any event, J.S. did understand Mr. McClain's slurs because Mr. Stepp explained them to J.S., "who immediately began to cry." App. Vol. I at 36. Also, the SAC's allegations clearly show that J.S. perceived Mr. McClain's conduct to be abusive, sufficient to allege an equal protection violation. For example, the SAC alleged that "[t]hrough the first weeks of school, McClain increasingly singled out

51

J.S. for repeated and excessive discipline." *Id.* at 33. And it described specific instances of Mr. McClain yelling at J.S. in "a loud and violent manner" such that J.S. was "reduced to tears in front of all [his] peers." *Id.* at 34. At least on one occasion, he refused J.S.'s requests "to go to the office or call his dad." *Id.*

As for the sexually-related conduct, the SAC alleged that "McClain raised . . . inappropriate topics with his all-boys class, including at least a discussion about kissing and about drawings of male genitals" and "used these topics to target J.S. for harassment and bullying—pointing at J.S. and telling J.S.'s classmates that they must not draw male genitals because J.S. is 'queer.' McClain then joined other students in laughing at this comment." *Id.* at 35.

The SAC further alleged that Mr. McClain, "after witnessing J.S. and other boys playfully roughhousing, . . . instructed his class that they should yell 'f** alert!' any time that another boy unwantedly touched them." *Id.* We conclude the allegations in the SAC were sufficient to establish that J.S. perceived Mr. McClain's comments and conduct as "unwelcome" and that it plausibly stated an equal protection violation.

b. *Clearly established law*

On clearly established law, the Stepps, in their response to the motion to dismiss, pointed to *Escue* and *Starrett v. Wadley*, 876 F.2d 808 (10th Cir. 1989). App. Vol. I at 258. *Starrett,* a § 1983 equal protection claim based on sexual harassment, is distinguishable from this case because it involved adult-on-adult sexual harassment that occurred in a workplace setting. 876 F.2d at 811-12.

*Escue*, on the other hand, is factually closer because it involved sexual harassment by a professor against a student. 450 F.3d at 1149. Although we did not discuss the elements of a § 1983 equal protection sexual harassment claim in *Escue*, we approved the district court's jury instructions, which stated that a teacher or professor violates a student's "constitutional right to be free from sex discrimination under the equal protection clause of the Fourteenth Amendment if" the defendant's "conduct subjected" the student "to sex discrimination," "the conduct was unwelcome," and "the conduct was sufficiently severe or pervasive as to interfere unreasonably with [the student's] school performance and create a hostile or abusive educational environment." *Id.* at 1157. This discussion in *Escue* was sufficient to place a reasonable teacher in Mr. McClain's position on notice that his alleged conduct was unconstitutional. *See Lowe*, 864 F.3d at 1208 (holding that prior case law "is considered on point if it involves *materially similar conduct* or applies with *obvious clarity* to the conduct at issue" (quotations omitted)).

The Stepps also rely on *Doe v. Hutchinson*, 728 F. App'x 829 (10th Cir. 2018) (unpublished), which concerned a high school student's § 1983 equal protection claim alleging the defendant teacher and football coach made inappropriate sexual comments to her and about her to other students, leading her to withdraw from school. *Id.* at 830-31. We affirmed the district court's denial of a motion to dismiss based on qualified immunity. We "agree[d] . . . that [the plaintiff] . . . adequately pled a constitutional violation," *id.* at 832, and noted that "[i]t is well established in this circuit that sexual harassment by a state actor can constitute a violation of the

53

equal protection clause," *id.* (quotations omitted). Although factually analogous, *Doe*, as an unpublished case, cannot serve as clearly established law, but it can be "supportive" of the plaintiff's alleged claim. *Krueger*, 154 F.4th at 1208 n.27.

*Doe* not only is supportive as factually comparable, it also cited the following published decisions supporting clearly established law. In *Sh.A. ex rel. J.A. v. Tucumcari Municipal Schools*, 321 F.3d 1285 (10th Cir. 2003), we said "that the law holding that sexual harassment is actionable as an equal protection violation has long been clearly established," and rejected the defendant's argument that "the standard set out in employment cases" could not be applied "to teacher-on-student sexual harassment." *Id.* at 1288. We noted that the Supreme "Court clearly indicated in 1992 that the same sexual harassment standards apply in both the employment context . . . and in the teacher-on-student sexual harassment" context. *Id.* at 1289 (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)). Further, we held in *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999), that "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile . . . environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *Id.* at 1097. "This is because . . . gender-neutral harassment makes up an important part of the relevant . . . environment." *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005). We also held in *O'Shea* that sexually-charged comments, even if not directly about gender, can qualify as gender-related. 185 F.3d at 1099.

We conclude that *Escue* and these other authorities applied with "*obvious clarity* to the conduct at issue" in this case, *Lowe*, 864 F.3d at 1208 (quotations omitted), and thus would have placed a reasonable teacher in Mr. McClain's position on notice that his conduct was unconstitutional. The district court therefore properly denied him qualified immunity.

## IV. CONCLUSION

In the School District Defendants' appeal, No. 25-7038, we

(1)  reverse the district court's denial of the motion to dismiss the portion of Count Five of the SAC that alleged a procedural due process claim against Principal Anderson, Superintendent Lockhart, and the individual Board members;

(2)  affirm the district court's denial of the motion to dismiss the portion of Count Five that alleged an equal protection claim against Principal Anderson, Superintendent Lockhart, and the individual Board members;

(3)  affirm the district court's denial of the motion to dismiss the Count Six retaliation claim alleged against Principal Anderson and Mr. Blair;

(4)  reverse the district court's denial of the motion to dismiss the Count Six retaliation claim alleged against Mr. Bryant;

(5)  dismiss for lack of interlocutory jurisdiction Defendants' challenge to the district court's denial of the motion to dismiss the Count Seven conspiracy claim; and

(6)  reverse the district court's denial of the motion to dismiss the retaliation claim alleged against Superintendent Lockhart and the Board members in Count Nine.

In Mr. McClain's appeal, No. 25-7039, we

(1) reverse the district court's denial of Mr. McClain's motion to dismiss the portion of Count Four of the SAC that asserted a substantive due process claim; and

(2) affirm the district court's denial of Mr. McClain's motion to dismiss the portion of Count Four that asserted an equal protection claim.

We remand to the district court for further proceedings consistent with this opinion.